[S. F. No. 6392. In Bank—December 15, 1914.]

ALBERT PICK & COMPANY (a Corporation), Respondent, v. FRANK C. JORDAN, as Secretary of State of the State of California, Appellant.

CORPORATION—FOREIGN CORPORATION DOING INTERSTATE AND INTRA-STATE BUSINESS—LICENSE-TAX—VALIDITY OF.—The case of *Mulford Co.* v. *Curry*, 163 Cal. 276, in which this court held the act of 1905 (Stats. 1905, p. 493), providing for a license-tax upon corporations, and requiring every corporation, incorporated under the laws of this state, and every foreign corporation then doing, or which should thereafter engage in business in this state, to procure annually from the secretary of state a license authorizing it to transact business in the state and to pay therefore a license-tax gradated upon the amount of its authorized capital stock, and section 416 of the Political Code, requiring corporations to pay the secretary of state, for his services in filing their articles of incorporation, certain fees gradated upon the amount of their capital stock, to be unconstitutional and void, as to foreign corporations engaged in carrying on an interstate as well as an intrastate business, for the reason that such exactions are the imposition of a direct burden upon their interstate commerce in violation of the commerce clause of the constitution of the United States, and also an illegal tax on their property situated outside of the state, cannot further be regarded as an authority, since the decision of the supreme court of the United States in the cases of *Baltic Mining Co.* and *White Dental Manufacturing Co.* v. *Massachusetts*, 231 U. S. 68, in which that court held such exaction to be valid.

ID.—LICENSE-TAX—NATURE OF—EFFECT OF CASE OF BALTIC MINING CO. v. MASSACHUSETTS—TAX HELD VALID.—In conformity with the decision of the United States supreme court in the cases of *Baltic Mining Co.* and *S. S. White Dental Co.* v. *Commonwealth of Massa-*

CLXIX Cal.—1

*chusetts,* 231 U. S. 68, it is held, in this proceeding in *mandamus* to compel the secretary of state to file a certified copy of articles of incorporation of a foreign corporation engaged in carying on both an interstate and an intrastate mercantile business in this state, without prepayment of the fee fixed by section 416 of the Political Code, and the fee prescribed by section 2 of the act relating to revenue and taxation, providing for a license-tax on corporations (Stats. 1905, p. 493), that as to both of the license fees in question their payment is exacted as a privilege or occupation tax exclusively upon the right to do a domestic business within the state of California; that these taxes are excise taxes and not property taxes, and that the tax is not on, nor based on, the capital stock of the corporation, but is merely admeasured by that capital stock; that in every case it is practicable to segregate strictly domestic business of a corporation from its interstate business, and for these reasons such corporations should be required to pay the fees prescribed by the law.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   J. M. Seawell, Judge.

.The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, Raymond Benjamin, Chief Deputy Attorney-General, and John H. Riordan, Deputy Attorney-General, for Appellant.

McClellan & McClellan, for Respondent.

J. C. Campbell, David L. Levy, and J. C. Campbell, Weaver, Shelton & Levy, *Amici Curiae.*

HENSHAW, J.—Petitioner is a corporation, organized under the laws of the state of Illinois, for the purpose of manufacturing and selling and generally dealing in china, glassware, pottery, restaurant supplies, and other merchandise.   It manufactures none of the enumerated articles in the state of California.   However, as it avers, in its petition, it has for a long time been engaged in interstate commerce in these goods and wares between the state of Illinois, the state of California, and other states of the United States.   It maintains a branch office and place of business in the city and county of San Francisco, and sells its goods, wares, and merchandise in the city and county of San Francisco and in other states of the United States, and ships its goods, wares, and merchandise from the state of Illinois into the state of California

and into other states, and from the state of California into other states. It has tendered to the secretary of state for filing a certified copy of its articles of incorporation with other appropriate papers required by the laws of the state, and the secretary of state has refused to file the same excepting upon prepayment of the fee fixed by section 416 of the Political Code (now 409, Pol. Code), and the fee prescribed by section 2 of the act relating to revenue and taxation providing for a license-tax on corporations. (Stats. 1905, p. 493.) Petitioner, refusing to pay the fees, made application to the superior court of the city and county of San Francisco for mandate against the secretary of state directing him to file these papers without payment of the fee exacted by the terms of subdivision 4 of section 409 above cited and the corporation license-tax of 1905.

The secretary of state answered, setting forth that the petitioner, besides the conduct of interstate commerce in which it is admittedly engaged, transacts "a large volume of intrastate business within the state of California; that said intrastate business forms no part of and is neither inextricably nor necessarily connected with the interstate business of said company, and respondent further alleges that its said interstate business is nowise dependent upon the aforesaid intrastate business of said company; that the authorized capital stock of said company amounts to one million dollars."    A general demurrer to this answer was interposed and sustained, and the trial court filed its findings of fact and conclusions of law, wherein it declared in accordance with the allegations of the petition and awarded the mandate prayed for.    The secretary of state has appealed from this judgment.

Upon this appeal we are asked to distinguish this case from that of *Mulford Co.* v. *Curry,* 163 Cal. 276, [125 Pac. 236], where this court, in the matter of the exaction of taxes or fees upon corporations engaged in interstate commerce, sought (though perhaps in vain) to determine the underlying principles and to follow the rulings of the supreme court of the United States enunciated in that series of cases, beginning with *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, [54 L. Ed. 355, 30 Sup. Ct. Rep. 190].    We are asked to do this because of the new light which it is said has been shed upon the legal questions involved by the cases of *Baltic Mining Co.* and *S. S. White Dental Manufacturing Co.* v. *Common-*

*wealth of Massachusetts,* decided by the supreme court of the United States, and reported in 231 U. S. 68, [58 L. Ed. 127, 34 Sup. Ct. Rep. 15].

In *Mulford Co.* v. *Curry* this court expressed the reluctance it felt over the necessity of applying the principles of the *Western Union Telegraph Co.* v. *Kansas* and the other like cases to the fiscal and revenue laws of the state. It did so under the compulsion of its oath to uphold the constitution and laws of the United States as expounded by its highest judicial tribunal. If we were in error in our understanding of the law, if the supreme court of the United States has latterly thrown new light upon its own exposition of the law, or if it has receded from any of the views which it has expressed in the earlier cases, it is for this court to remodel its own decisions in swift conformity therewith.

It becomes necessary, therefore, even at the peril of prolixity, to set forth the understanding which this court had, and which in *Mulford Co.* v. *Curry* it expressed, of the legal principles enunciated and the legal controversies decided in that series of cases beginning with the *Western Union Telegraph Co.* v. *Kansas.* By the law of Kansas every foreign corporation "seeking to do business in this state" was required to file a copy of its charter or of its articles of incorporation with the secretary of state, and, when so filing, to "pay to the state treasurer of Kansas, for the benefit of the permanent school fund, a charter fee of one-tenth of one per cent of its authorized capital upon the first $100,000 of its capital stock or any part thereof, and upon the next $400,000 or any part thereof one-twentieth of one per cent; and for each million or major part thereof over and above the sum of $500,000, $200." The Western Union Telegraph Company, a New York corporation, was conducting business in the state of Kansas. That business was both interstate, involving the reception within the state of messages from points outside of the state, and, conversely, the sending of messages from points within the state to points outside the state, and intrastate or domestic, consisting of the sending and reception of messages between different points wholly within the state. It refused to make the filing and pay the fee prescribed by the Kansas statute, and the state brought its action in one of its own courts against the company, seeking to oust and restrain it from doing any *domestic* business within the state, such being one of the penalties by the laws of Kansas

prescribed. The state court rendered its decree of ouster and restraint as prayed for. The cause was transferred under writ of error to the supreme court of the United States, and there decided by a sharply divided court upon an elaborate opinion handed down by Mr. Justice Harlan. The Western Union Telegraph Company was capitalized for one hundred million dollars. The "charter fee" (such is the description of the fee used by the state of Kansas) in the case of the Western Union Telegraph Company amounted to twenty thousand one hundred dollars.

Amongst the contentions of the state of Kansas in support of the validity of the judgment of its court were that it had the absolute right to impose the terms and conditions upon which a foreign corporation might do a domestic business within its territorial limits; that the fiscal law under review imposed as such condition the payment of a charter fee based on or admeasured by the par value of the capital stock of corporations; that this was not a tax upon the property of the corporation either within or without the state, but was "a local police regulation on local business only"; that the fact that the statute might cause inconvenience to interstate business did not render it unconstitutional; and that the failure to comply with the law did not prevent the foreign corporation from continuing to the fullest extent in engaging in interstate commerce. The opposed contentions of plaintiff in error are set forth by the supreme court in the opening paragraph of the opinion which it rendered in that case. They are as follows:

"The contentions of the company, to which particular attention will be directed, are, in substance, that the requirement that it pay, for the benefit of the permanent school fund of the state, *a given per cent of its authorized capital,* wherever and however employed, as a *condition* of its right to continue to do domestic business in Kansas, is a regulation which, by its necessary operation, directly burdens or embarrasses interstate commerce, and, therefore, is illegal under the commerce clause of the constitution; further, that such a requirement involves the taxation not only of the company's interstate business everywhere, but equally the property employed by it beyond the limits of the state, a thing which could not be done consistently with the due process of law enjoined by the fourteenth amendment."

And, here, at the outset, it may be well to state that each and every one of these contentions is to the fullest extent sustained by the decision. It is to be remembered that the supreme court itself declares that these contentions are the ones to which particular attention will be directed. What the supreme court decides is, that without regard to the name by which the license, or fee, or excise, or impost, or occupation, or privilege tax may be called, when it takes the *form* that it took in Kansas, of an exacted payment of a given per cent of the authorized capital stock, this exaction accomplishes two distinct illegal and unconstitutional results. First, it is in legal effect a tax upon all of the property represented by the capital stock of the corporation, therefore a tax upon such parts of the property as were engaged in interstate commerce, and therefore an invalid tax under the commerce clause of the constitution of the United States; and, second, it is an attempt by the state to tax property beyond its territorial jurisdiction, and is therefore confiscatory in nature and violative of the fourteenth amendment of the constitution. That there can be no possibility of misunderstanding the meaning of the supreme court in this particular we shall employ a few quotations from its decisions. But before doing so we will quote one sentence from the dissenting opinion of Mr. Justice Holmes in this particular case. Bearing in mind that the majority of the supreme court declared that the Kansas law imposed a tax, we note Justice Holmes in dissenting saying: "I assume that a state cannot tax a corporation on commerce carried on by it with another state, or on property outside the jurisdiction of the taxing state; and I assume further that for that reason a tax on or *measured by* the value of the total stock of a corporation like the Western Union Telegraph Company, is void." (Mr. Justice Holmes' argument proceeds upon the view that Kansas had not imposed a tax at all. "She simply has said to the company that if it wants to do local business it must pay a certain sum of money. . . . The whole matter is left in the Western Union's hands.") The prevailing opinion declared that there was no decision "holding that a state may by any device or in any way, whether by a license-tax in the form of a fee, or otherwise, burden the interstate business of a corporation of another state. . . . If the statute reasonably interpreted, either directly or by its necessary operation, burdens interstate commerce, it must be adjudged to

be invalid whatever may have been the purpose for which it was enacted, and although the company may do both an interstate and local business. This court has repeatedly adjudged that in all such matters the judiciary will not regard mere form, but will look through the form to the substance of things.'' Then says the court:

''Looking, then, at the natural and reasonable effect of the statute, disregarding mere forms of expression, it is clear that the making of the payment by the Telegraph Company, as a charter fee, of a given per cent *of its authorized capital,* representing, as that capital clearly does, *all* of its business and property, both within and *outside of the state,* a *condition* of its right to do local business in Kansas, is, in its essence, not simply a tax for the privilege of doing local business in the state, but a burden and tax on the company's interstate business and on its property located or used outside of the state. The express words of the statute leave no doubt as to what is the *basis* on which the fee, specified in the state statute, rests. That fee, plainly, is not based on such of the company's capital stock as is represented in its local business and property in Kansas. The requirement is a given per cent of the company's authorized capital, that is, all its capital wherever or however employed, whether in the United States or in foreign countries, and whatever may be the extent of its lines in Kansas as compared with its lines outside of that state. What part of the fee exacted is to be attributed to the company's domestic business in Kansas and what part to interstate business, the state has not chosen to ascertain and declare in the statute. It strikes at the company's entire business wherever conducted, and its property wherever located, and, in terms, makes it a *condition* of the telegraph company's right to transact purely local business in Kansas that it shall contribute for the benefit of the state school fund a given per cent of its whole authorized capital, representing all of its property and all its business and interests everywhere. . . . So, in the case now before us, the exaction as a condition of the privilege of continuing to do or doing local business in Kansas, that the Telegraph Company shall pay *a given per cent of its authorized capital stock,* is, for every practical purpose, a tax both on the company's local business in Kansas, and on its interstate business or on the privilege of doing interstate business; for, the statute, by its necessary operation, will accomplish pre-

cisely the result that would have been accomplished had it been made, *in express words,* a condition of doing local business that the Telegraph Company should submit to taxation upon both its interstate and intrastate business and upon its interests and property everywhere, as represented by its capital stock. The exaction made by the Kansas statute is as much a tax on the interstate business of the company and on its property outside of the state as a fee or tax on the sale of an article imported only for sale or as a tax on the occupation of an importer would be a tax on the property imported.''

In the course of its argument and in demonstration that its reasoning was not meant to apply exclusively to that class of corporations known as common carriers, it uses this illustration: ''If a domestic corporation engaged in the business of soliciting orders for goods manufactured, sold and delivered in a state, should, in addition, solicit orders for goods manufactured in and to be brought from another state for delivery, could the former state make it a *condition* of the right to engage in local business within its limits that the corporation pay a given per cent of *all* fees or commissions received by it in its business, interstate and domestic? There can be but one answer to this question,—namely, that such a condition would operate as a direct burden on interstate commerce, and therefore would be unconstitutional and void. Consistently with the constitution no court could, by any form of decree, recognize or give effect to or enforce such a condition.'' And in announcing the familiar doctrine that Kansas might exact a license-tax of the corporation ''strictly on account of local business done by it in that state,'' it couples this statement with the declaration: ''But it is altogether a different thing for Kansas to deny it the privilege of doing such local business, beneficial to the public, except on condition that it shall *first* pay to the state a given per cent of all its capital stock, representing all of its property, wherever situated, and all its business in and outside of the state.'' And the opinion concludes as follows: ''The right of the Telegraph Company to continue the transaction of local business in Kansas could not be made to depend upon its submission to a condition prescribed by that state, which was hostile both to the letter and spirit of the constitution. The company was not bound, under any circumstances, to surrender its constitutional exemption from state taxation, direct or indirect, in respect of its interstate business and its

property outside of the state, any more than it would have been bound to surrender any other right secured by the National Constitution.''

The next case of *Pullman Co.* v. *Kansas*, 216 U. S. 56, [54 L. Ed. 378, 30 Sup. Ct. Rep. 232], arose under the same Kansas statute, Mr. Justice Harlan again delivering the opinion. It reiterates and reaffirms the opinion and decision of the Western Union case, and defines that decision in terms, in the following language.

''The Charter Board, we have seen, gave it permission to engage in intrastate business in Kansas on *condition* that it should pay to the state treasurer *for the benefit of the permanent school fund of the state,* as a charter fee, the sum of $14,800, which is the prescribed statutory per cent of the company's authorized capital, representing *all* of its property and interests everywhere, in and out of the state, and *all* its business, both interstate and intrastate. It does not appear how much of the single 'fee' demanded by the state is to be referred to the interstate business of the company nor how much to its property outside of the state, nor what part has reference to its intrastate business or to its property within the state.'' . . . ''We hold (2) That the requirement that the company, as a condition of its right to do intrastate business in Kansas, should, in the form of a fee, pay to the state a specified per cent of its authorized capital, was a violation of the constitution of the United States, in that such a single fee, based as it was on all the property, interests and business of the company, within and out of the state, was, in effect, a tax both on the interstate business of that company, and on its property outside of Kansas, and compelled the company, in order that it might do local business in Kansas in connection with its interstate business, to waive its constitutional exemption from state taxation on its interstate business and on its property outside of the state and contribute from its capital to the support of the public schools of Kansas.''

Mr. Justice White filed a concurring opinion in that case, in which, while assenting to the views of his associates, he carried the doctrine further than they, declaring, with unimpeachable logic: ''It is not by me doubted that as a practical question the arbitrary prohibition against doing a local business imposed on one engaged in and having the right to engage in interstate commerce is to burden that business.''    Epigram-

matically, he presents the controversy in the following sentences: "The only right here challenged is the authority of a state to impose an unconstitutional tax and validate the tax by making the payment of the unlawful tax a condition of the right to do a local business. And this upon the false assumption that absolute power to exclude exists; that is, to impose an unlawful tax and sustain it by another unlawful assumption of power, a process of reasoning which, to my mind, must rest on the proposition that in deciding questions of constitutional power it is to be held that two wrongs make a right." Mr. Justice Holmes again dissented, reiterating in amplified form the views expressed in his earlier dissent, and concluding: "I think that the tax in question, *for I am perfectly willing to call it a tax,* was lawful under all the decisions of this court until last week." (The italics are ours.)

The next case was *Ludwig* v. *Western Union Telegraph Co.,* 216 U. S. 146, [54 L. Ed. 423, 30 Sup. Ct. Rep. 280]. This case had to do with an Arkansas law, which required all foreign corporations to file copies of their charters or articles of incorporation with the secretary of state, under heavy penalties for failure so to do, and required them also to pay into the treasury of the state, "for the filing of said articles a fee of $25 where the capital stock is $50,000 or under; $75 where the capital stock is over $50,000 and not more than $100,000, and $25 additional for each $100,000 of capital stock." The supreme court of the United States declared that the case could not "be distinguished in principle from *Western Union* v. *Kansas* and *Pullman Co.* v. *Kansas,*" and that the difference in the wording of the Kansas and Arkansas statutes —the former being in the nature of a percentage tax, the latter naming fixed sums of money based upon capitalization—did not differentiate the cases so as to take the Arkansas statute out of the ruling of the former cases. These cases were followed by *Atchison etc. Railway Co.* v. *O'Connor,* 223 U. S. 280, [Ann. Cas. 1913C, 1050, 56 L. Ed. 436, 32 Sup. Ct. Rep. 216]. The statute of Colorado exacted a "fee" of a foreign corporation of two cents upon each $1000 of its capital stock, which fee it was declared was for the right to do a local business within the state. The action was brought to recover the tax paid under protest. Mr. Justice Holmes, who dissented in the earlier cases, delivering the opinion of the court, declared: "Therefore it is obvious that the tax is of the kind decided by

this court to be unconstitutional, since the decision below in the present case, even if the temporary forfeiture of the right to do business declared by the statute be confined by construction, as it seems to have been below, to business wholly within the state."

Again the question arose in *International Textbook Co.* v. *Pigg,* 217 U. S. 91, [18 Ann. Cas. 1103, 27 L. R. A. (N. S.) 493, 54 L. Ed. 678, 30 Sup. Ct. Rep. 481]. The International Textbook Company was a Pennsylvania corporation, organized for purposes of profit and with a capital stock. It combined the publication of textbooks and courses of instruction in various arts and sciences with an educational school conducted by correspondence, to the students of which it transmitted for a consideration these textbooks and educational courses. It employed salaried agents within specified territories to secure pupils or students. It did so in Kansas. It failed or refused to comply with certain provisions of the Kansas statute, one, the provision for the charter fee considered in *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, [54 L. Ed. 355, 30 Sup. Ct. Rep. 190], and, another, the provision requiring it to file with the secretary of state a detailed statement showing the authorized capital, the paid-up capital stock, the amount of assets and liabilities, etc. etc. Among the penalties prescribed for a failure so to do was the denial of the right to the defaulting corporation to maintain an action in any of the courts of the state. The International Textbook Company sued Pigg as a debtor under one of its contracts of instruction. The supreme court of the United States reaffirmed the invalidity of the Kansas charter fee statute, and further declared: "It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business. But such a burden is imposed when the corporation of another state, lawfully engaged in interstate commerce, is required, as a condition of its right to prosecute its business in Kansas, to make and file a statement setting forth certain facts which the state, confessedly, could not control by legislation. It results that the provision as to the statement mentioned in section 1283 must fall before the constitution of the United States, and with it—according to the established rules of statutory construction—must fall that part of *the same section* which provides that the obtaining of the certificate of the secretary of state that such statement has

been properly made shall be a condition precedent to the right of the plaintiff to maintain an action in the courts of Kansas."

And, finally, was decided *Bucks Stove & Range Co.* v. *Vickers*, 226 U. S. 205, [57 L. Ed. 189, 33 Sup. Ct. Rep. 41], where this purely manufacturing and mercantile corporation offended against the same Kansas law, and was held by the supreme court to be immune from punishment therefor, under authority of the Pigg case.

We have now considered all of the decisions of the supreme court of the United States (saving the Massachusetts cases hereinafter to be reviewed) which can have any bearing upon the questions before us. It becomes pertinent here to take up for brief analysis the case of *Mulford Co.* v. *Curry*, 163 Cal. 276, [125 Pac. 236], wherein in this state the foregoing decisions of the supreme court first came under review. The more pertinent does it become to do this since the statutes in the present case under review are in all substantial particulars identically the same as they were when *Mulford Co.* v. *Curry* was decided. A reference to *Mulford Co.* v. *Curry* will save a repetition of the language of those statutes. It should be added that section 410 of our Civil Code declares that every foreign corporation which shall neglect or fail to comply with the conditions of sections 408 and 409 of the code shall be subject to a fine of not less than five hundred dollars, to be paid into the state treasury to the credit of the general fund, and every such corporation so failing is denied the right to "maintain any suit or action in any of the courts of this state, or acquire or convey any legal title to any real property within the state, until it has complied with said section." This language is as general as language can be made. It is declared applicable to "*every* corporation organized under the laws of another state or territory or of a foreign country." Section 408 requires "*every* corporation organized under the laws of another state, territory, or of a foreign country, . . . file in the office of the secretary of state of the state of California a certified copy of its articles of incorporation," etc. The language of section 416 of the Political Code quoted in *Mulford Co.* v. *Curry* has become by amendment the language of the present section 409 of the same code.

The Mulford Company, like the petitioner in the case at bar, was a commercial corporation organized to do, and doing, an interstate business and an intrastate business within the state

of California. Like the present petitioner, it objected to the payment of the fees exacted by our laws, and after tendering certain nominal filing fees sought mandate against the secretary of state to compel him to receive and file certain documents, the filing of which was called for by our laws. That part of our laws to which the Mulford Company in especial objected was section 416 of the Political Code (now 409). This law, it will be noted (as did the Kansas statute), imposes a single fee upon corporations which it is made mandatory upon the secretary of state to collect for filing their articles of incorporation, the other sections referred to requiring that such articles be filed. In addition to this law, requiring foreign corporations to pay this fee before they can engage in business in the state of California at all, we have upon our books another law designated in its title as ''A license-tax upon corporations,'' requiring them to pay an annual license-tax for the right to continue in business. (Stats. 1905, p. 493.) It was the first license law which this court had under especial consideration in the case of *Mulford Co.* v. *Curry.* This may be noted from the declaration in the case where the annual license-fee law is set out, that it is set out as ''having further relation to the matter.'' It was not important to the decision in the Mulford Company case to elaborate our views upon these acts separately. The latter one was referred to: 1. Because it formed a part of the same fiscal system; 2. Because it, too, based its license fee charges upon the authorized capital stock of corporations, and, 3. Because the practical effect in the case of every foreign corporation seeking to engage in business in the state of California was to require it to pay two fees. To illustrate, if the Western Union Telegraph Company had undertaken to engage in business in California, an analysis and computation will show that it would have been required to pay a fee of ten thousand dollars under sections 409 of the Civil Code and 416 of the Political Code, and a fee of two hundred and fifty dollars under the corporation License Tax Act, or a total of ten thousand two hundred and fifty dollars in California, as compared with twenty thousand one hundred dollars in Kansas.

Turning to the judgment in *Mulford Co.* v. *Curry,* it will be found that the only judgment rendered is a declaration that the requirement of section 408 of the Civil Code, that the petitioner file its articles of incorporation, is a reasonable require-

ment, but that the further requirement that as a condition of such filing the petitioner pay the fee exacted by section 409 of the Civil Code and 416 of the Political Code is illegal. Neither by the terms of the judgment nor by any express language in the opinion itself was the annual license-tax declared to be unconstitutional under the authority of the federal cases. But since the supreme court of the United States had declared that such fees, when based upon the total capital stock, were invalid exactions for the reasons given, the fear was felt and expressed that even the annual corporation license-tax so founded upon the total capital stock might fall under the same ban, and this court sought to advise the legislature as to what it conceived the supreme court of the United States had declared to be the limit of the law-making power in the matter.

What, then, did the supreme court of the United States decide in its cases?

It decided: (a) That it would review and consider the language of each state fiscal act and determine for itself, regardless of the determination of the states' legislative or judicial departments, what in fact the law did mean and what in fact it did accomplish, quoting with approval from *Galveston, Harrisburg etc. Co.* v. *Texas,* 210 U. S. 217, [52 L. Ed. 1031, 28 Sup. Ct. Rep. 638], to the following effect: "Neither the state courts, nor the legislatures, by giving the tax a particular name, or by the use of some form of words, can take away our duty to consider its nature and effect." (b) If under the interpretation of the supreme court it resulted that a particular statute "either directly or by its necessary operation burdens interstate commerce, it must be adjudged to be invalid, whatever may have been the purpose for which it was enacted, and although the company may do both interstate and local business." (c) It decided that interstate commerce was illegally burdened by a tax or fee directly on or based on the total capital stock of a corporation which, though engaged in local business within a state, was also engaged in interstate commerce. Thus we find the court in *Pullman Co.* v. *Kansas,* saying that "the requirement that the company, as a condition of its right to do intrastate business in Kansas, should, in the form of a fee, pay to the state a specified per cent of its authorized capital, was a violation of the constitution of the United States, in that such a single fee, based as it was on all the property interests and business

of the company within and without the state, was in effect a tax both on the interstate business of that company and on its property outside of Kansas." Again, we find Mr. Justice Holmes in his dissenting opinion "assuming" and conceding that "a tax on or *measured by* the value of the total stock of a corporation like the Western Union Telegraph Company is void." And again we have him declaring in his dissenting opinion in the Pullman case: "I think that the tax in question (for I am perfectly willing to call it a tax) was lawful."
(d) We find that the unconstitutionality and illegality of the tax so based and levied are declared to exist upon two separate and wholly unrelated grounds, which grounds are enunciated and re-enunciated time and again. Those grounds may be thus stated: The requirement to pay a given per cent of the capital stock as a prerequisite of the right to do a local business, exacts burdensome and unconstitutional conditions from the corporation; the first, that the state thus taxes the instrumentalities and properties used in interstate commerce which lie without the taxing power of the state, and thus unduly burdens interstate commerce in violation of the commerce clause of the constitution; and, the second, that such an act in taxing property without the jurisdiction of the taxing power requires a corporation seeking to do local business within a state to waive its constitutional right of exemption from taxation on its property lying outside of the state.
(e) These results are declared to follow from the act of taxing the whole capital stock of such a corporation and are nowhere and nowise declared to be dependent either upon the amount of the capitalization of the corporation, nor upon the amount of the tax exacted from that corporation. We perceived, or thought we perceived, the ground for this in the principle that if the power to tax in a given way be conceded, the amount of the tax is vested wholly in the discretion of the taxing power, and we had in mind not only the language of Chief Justice Marshall "that the power to tax involves the power to destroy," (*McCullough* v. *Maryland,* 4 Wheat. 316, [4 L. Ed. 579]), but also the language of *Brennan* v. *Titusville,* 153 U. S. 289, [38 L. Ed. 719, 14 Sup. Ct. Rep. 829], quoted with approval in the Western Union case, in reference to such license-taxes, that "if a state may lawfully exact it, it may increase the amount of the exaction until all interstate commerce in this mode ceases to be possible." (f) That

in thus guarding interstate commerce from unlawful interference, the supreme court would be governed not by what a given charge was or was called, but by consideration of what in its operation was its effect upon such commerce. For we find in the Western Union Telegraph case the following language quoted with approval from *Ashley* v. *Ryan,* 153 U. S. 436, [38 L. Ed. 773, 14 Sup. Ct. Rep. 865] : "Whether this charge be viewed as a tax, a license or a fee, if its exaction violated the interstate commerce clause of the constitution of the United States, or involved the assertion of the right of a state to exercise its powers of taxation beyond its geographical limits, it was void, whatever might be the technical character affixed to the exaction." (g) We believed that the supreme court meant and declared for the indicated reasons that the method of charging a fee upon foreign corporations for the right to do a local business on or based on the capital stock of such corporations was forever inhibited, the supreme court saying, "There are sufficient modes in which the internal business, if not already taxed in some other way, may be subjected to taxation without the imposition of a tax which covers the entire operations of the company." (*Leloup* v. *Port of Mobile,* 127 U. S. 640, [32 L. Ed. 311, 8 Sup. Ct. Rep. 1383].) And to the declaration of Mr. Justice Holmes in his dissenting opinion to the following effect: "If after this decision the state of Kansas, without giving any reason, sees fit simply to prohibit the Western Union Telegraph Company from doing any more local business there, or from doing local business until it has paid $20,100, I shall be curious to see upon what ground that legislation will be assailed," we believed that the answer would be, as above indicated, that it was not the *amount* of the charge which determined the invalidity, but the fact that in its form the charge was laid upon property without the taxing power of the state, and that to submit to the payment of it in such a form (that is, a tax on all the capital stock) would be to force the surrender upon the part of the corporations of their well-defined constitutional rights. Thus, if a man who is on his way to church to give a hundred dollars to charity is robbed of that hundred dollars by a highwayman, his financial condition is exactly the same as it would have been had he carried out his purpose. Yet it will not be said that this fact leaves him uninjured and without grievance.

These, then, were some of the conclusions which we drew from the decisions of the supreme court and which, with more or less completeness, we sought to declare in *Mulford Co.* v. *Curry.* One part of the judgment of the supreme court we conceived to be apodictic and that was that all the capital stock of such a corporation could not be subjected to any tax without doing violence to the constitution of the United States, and it was under this conviction that we sought in *Mulford Co.* v. *Curry* to enlighten our legislative department as to the danger which would attach to all laws basing license fees of a foreign corporation on this method of taxation.

There arose in Massachusetts two cases of similar import, *Baltic Mining Co.* v. *Commonwealth*, 207 Mass. 381, [93 N. E. 831], and the *S. S. White Dental Manufacturing Co.* v. *Commonwealth*, 212 Mass. 35, [Ann. Cas. 1913C, 805, 98 N. E. 1056]. For convenience we may refer to but one and call that the Dental Company case. The Dental Manufacturing Company was a Pennsylvania corporation, having no factories in Massachusetts, but engaged in domestic business within the state of Massachusetts, as well as in interstate commerce. The Massachusetts revenue laws provided that, "Every foreign corporation shall, in each year, at the time of filing its annual certificate of condition, pay to the treasurer and receiver general, for the use of the commonwealth, an excise tax, to be assessed by the tax commissioner, of one-fiftieth of one per cent of the par value of its authorized capital stock as stated in its annual certificate of condition; but the amount of such excise tax shall not in any one year exceed the sum of $2000." The Dental Manufacturing Company objected to the payment of the tax upon the three grounds so clearly enunciated in *Western Union Telegraph Co.* v. *Kansas.* Those grounds, as stated by the supreme court of the United States, to which the case subsequently went on writ of error, being: "First, the tax is 'a regulation of interstate commerce, in that it imposes a direct burden upon that portion of the business and capital of the plaintiffs in error which is devoted to interstate commerce; second, the tax is in violation of the due process of law clause, because it attempts to impose taxes upon property beyond the jurisdiction of the commonwealth of Massachusetts; and, third, the tax denies to the plaintiffs in error the equal protection of the law."

The supreme court of Massachusetts, after a painstaking review of its taxation history, its peculiar system of taxation and the decisions of its courts, held the tax to be a pure excise tax, "excise tax" as thus employed meaning a privilege tax upon the right to pursue an occupation, and not a tax upon property at all. It declared that it recognized that the supreme court of the United States would look through the form to the substance and determine for itself whether such an impost was or was not a property tax or a burden upon interstate commerce, and to this point cited the decisions of the supreme court which we have been considering. But it declared that there were "at least two important and, as we think, vital distinctions between these cases and the one at bar." The first of those distinctions is declared to be the fact that in the cases before the supreme court of the United States the corporations, though one and all engaged in domestic commerce, were common carriers, organized for the transportation of intelligence, commerce, and persons between the states, and that their local business could not be given up without impairing their capacity to transact their interstate business. And the second distinction was that the maximum fee allowed by the Massachusetts statute was two thousand dollars, while in the Kansas and Arkansas statutes the tax was graded and increased by the amount of the capital stock, and to the mind of the supreme court of Massachusetts "this provision demonstrates that it is not a property tax but only an excise, so limited that it cannot reach beyond a reasonable license fee." Further, the supreme court of Massachusetts points out that a flat rate of two thousand dollars might have been exacted of all corporations without doing violence to any right guaranteed by the constitution of the United States, and that in fact what Massachusetts has done has been to diminish the burden upon corporations of smaller capitalization. Again, the Massachusetts court denotes, as a compelling reason for its determination, that the authorized capital stock of the Dental Company is a million dollars, while its assets aggregate $5,711,718.29, thus to its mind evidencing the fact that the tax was an excise and not a property tax on or based on its authorized capital stock. And, lastly, the supreme court of Massachusetts decided that the act did not apply to common carriers, railroad, telegraph, and telephone, which were taxed upon another plan; that it did not apply

to corporations whose sole business within the state was interstate commerce, nor yet to corporations carrying on both interstate and domestic commerce, whose domestic or intrastate business was conducted in such close connection with the other that it could not be abandoned without serious impairment of the interstate business. It held that the Dental Company's intrastate business was severably distinct from its interstate business, and that therefore it was liable to the payment of this excise tax for the privilege of carrying on that intrastate business.

These cases (*Baltic Mining Co.* and *S. S. White Dental Mfg. Co.* v. *Commonwealth of Massachusetts,* 231 U. S. 68, [58 L. Ed. 127, 34 Sup. Ct. Rep. 15]), as has been said, went to the supreme court of the United States, and in an opinion handed down by Mr. Justice Day, the judgment of the supreme court of Massachusetts, upholding the validity of its foreign corporation license-tax law and the liability of the Dental Company to pay this tax, was sustained, Chief Justice White, Mr. Justice Van Devanter and Mr. Justice Pitney dissenting. The ground of their dissent has not been stated, but we think it beyond peradventure that, looking through form to substance, they believed this Massachusetts tax, call it excise or what you will, was in fact a tax upon the total capital stock of the dental corporation and thus was a tax within the inhibition declared in the *Western Union Telegraph Co.* v. *Kansas* and the other like cases.

The supreme court of the United States adopts without reservation the determination of the supreme court of Massachusetts that this fee is an excise tax as distinguished from a property tax. It may at once be granted that it is that form of an excise tax which is frequently denominated a privilege or occupation tax, but it by no means follows that being an excise tax this is conclusive that it is not levied upon property. Indeed, many forms of excise tax are distinctly and admittedly levied upon property, and every definition of excise includes this kind of tax. An excise is "an inland impost levied upon articles of manufacture or sale and also upon licenses to pursue certain trades or dealing in certain commodities." (*Patton* v. *Brady,* 184 U. S. 617, [46 L. Ed. 713, 22 Sup. Ct. Rep. 496].) To say that because a tax is an excise it is not levied upon property is to throw all the reasoning of the supreme court in all these cases to the four winds.

The argument was made in these Kansas cases, and it was a sound argument, that the laws under consideration merely imposed an occupation or privilege tax—in short an excise tax—for the right to do a local business, and this was conceded by all of the justices of the supreme court. Their answer, however, to the conclusion sought to be drawn from this was that, notwithstanding that it is an excise tax or privilege or occupation tax, it is levied upon property beyond the taxing power of the state, and by the fact that it is so levied imposes a burden upon property without the state which is engaged in interstate commerce. We are unable to perceive, therefore, how the determination that the Massachusetts tax is an excise tax relieves it from the condemnation imposed upon the Kansas statute for attempting to do the same thing by fixing or basing its tax on the total capital stock of the corporation. As little do we perceive that the amount of the tax imposed by the Massachusetts law has materiality in the consideration. If the principle upon which its tax is based is a sound one, it may to-morrow increase the amount of the tax to any extent. It is true that in the earlier cases the corporations involved were common carriers and the supreme court of the United States makes mention of that fact in the Dental case, but it does not say that this consideration influenced or was determinative of the controversy. To the contrary, it does say that all corporations engaged in interstate commerce are under the equal protection of the commerce clause of the constitution, and, indeed, no distinction between them can justly be drawn. If it is important that common carriers—the instrumentalities by and through which commerce is conveyed, shall be protected from unwarranted burdens, it is equally necessary that the owners of the commerce to be conveyed should receive a like protection. While interstate commerce would unquestionably be vitally impaired if common carriers were eliminated, interstate commerce would be totally destroyed if the goods, wares, and merchandise embraced within the meaning of the word were debarred from interstate and foreign transportation. The supreme court of the United States points out very truly that in the Western Union Telegraph Company case and in the Pullman case, ''there was no attempt to separate the intrastate business from the interstate business.'' No such attempt is made by the Massachusetts law. True, the Massachusetts supreme

court, under a stipulation of facts, finds that about five per cent of the business of the Dental Company was intrastate. But there is no attempt in the law to impose any tax upon that part of its business nor upon the one hundred thousand dollars' worth of property which represents the company's holdings in the state. It would have been just as easy and as practicable to have shown in the Western Union Telegraph Company case the proportion of its local business as compared with its interstate business, and, indeed, in the case of every common carrier or commercial concern, we venture the assertion that not the slightest difficulty will be found in so doing. Indeed, we may recall the fact that this is required to be done in this state as a part of its revenue laws in the case of every common carrier engaged in interstate as well as intrastate business, and we have yet to hear of the first complaint touching the difficulty or impracticability of so doing. True it is that in the case of most, and we may say all, common carriers engaged in interstate commerce, the deprivation of local business is an injury and impairment of their business as a whole. But this is equally true of every commercial corporation likewise engaged in interstate and domestic business. Nor have we yet been told, nor are we told by this last decision of the supreme court, that this is a fundamental ground for destroying a state privilege tax otherwise constitutional. True, also, it is that in *Western Union Tel. Co.* v. *Kansas,* it is said that, "We cannot fail to recognize the intimate connection which at this date exists between the interstate business done by interstate companies and the local business which for the convenience of the people must be done, or can generally be better and more economically done, by such interstate companies rather than by domestic companies organized to conduct only local business." But in that same connection it is said that "It is of the last importance that the freedom of interstate commerce shall not be trammeled or burdened by local regulations, which, under the guise of regulating local affairs, really burden rights secured *by the constitution and laws of the United States.*" But as a state may absolutely exclude even a common carrier from doing a local business within its territory, and as this has been distinctly and in terms held in *Osborne* v. *Florida,* 164 U. S. 650, [41 L. Ed. 586, 17 Sup. Ct. Rep. 214], and *Pullman Co.* v. *Adams,* 189 U. S. 420, [47 L. Ed. 877, 23 Sup. Ct. Rep.

494], where in the prevailing opinion in the Western Union Telegraph Company case it is said, referring to these two cases, both dealing with common carriers, "The company cannot complain of being taxed for the privilege of doing a local business which it is free to renounce," and as, in even stronger language the same principle is declared in *Horn Silver Mining Co.* v. *New York,* 143 U. S. 305, [36 L. Ed. 164, 12 Sup. Ct. Rep. 403], it is not permissible for us to hold that the mere interference with or deprivation of local business by a state statute not in itself otherwise unconstitutional, becomes unconstitutional for its indirect influence on the interstate business of the company affected. As little are we able to perceive that the accidental fact that the White Dental Company's capital stock is one million dollars, while its total assets aggregate five million, seven hundred and eleven thousand dollars, has any determinative value in this consideration. If a corporation called upon to pay a tax of one-fiftieth of one per cent of its total capital stock, has assets amounting to five times the par value of its total capital stock, the tax amounts to one-two hundred and fiftieth of one per cent upon its total assets. If another corporation, however, capitalized for the same amount has assets to the value of only one-fifth of its capital stock, it results that the property of that corporation is taxed one-tenth of one per cent. So the burden is the heavier upon the poorer corporation. And in neither of the Massachusetts cases is there any attempt to segregate and impose the tax upon that portion of the property or that portion of the whole business lying within or done within the state imposing the tax. Or, again, if we consider the Kansas law in connection with the Massachusetts law, it is indisputable that both levy a *per centum* tax in terms upon the total capital stock. An important difference in favor of the Kansas law is that when this charge is once paid, the privilege of engaging in domestic business is continuously and indefinitely assured. It is one single occupation tax. In Massachusetts, however, it is an annual burden year by year. The corporation annually must pay the *per centum* for the renewed right to continue in business. In Kansas a corporation with a capital stock of two million five hundred thousand dollars would pay a single tax of seven hundred dollars. In Massachusetts that same corporation would pay annually a tax of five hundred dollars. It is certainly reasonable to suppose

that corporations engaging in interstate and domestic commerce desire to continue their local business for more than one year.   In two years the Massachusetts tax upon this corporation would exceed the Kansas charge.   So while the supreme court of the United States does not follow the reasoning advanced by the supreme court of Massachusetts, which the latter court held to differentiate its revenue law from that considered in the Kansas and other cases, it does in its recitals state many of the facts which the supreme court of Massachusetts considered to have a determinative bearing upon the question, some of which we have just now ourselves been considering.   What the supreme court of the United States does say is to reannounce the familiar proposition that every case, involving the validity of a tax must be decided upon its own facts, and at the conclusion of this recital to declare as follows: "The conclusion, therefore, that the authorized capital is only used as the measure of a tax, in itself lawful, without the necessary effect of burdening interstate commerce, brings the legislation within the authority of the state.   So, if the tax is, as we hold it to be, levied upon a legitimate subject of such taxation, it is not void because imposed upon property beyond the state's jurisdiction, for the property itself is not taxed.   In so far as it is represented in the authorized capital stock, it is used only as a measure of taxation, and, as we have seen, such measure may be found in property or in the receipts from property not in themselves taxable."   If we analyze this language correctly, it is a declaration that if a state imposes a privilege tax upon the right of a foreign corporation to engage in strictly domestic business within that state (thus we construe the language "the tax levied upon a legitimate subject of such taxation") "this tax is not void because it is imposed (levied or assessed) upon property beyond the state's jurisdiction" for the reason that "the property itself is not taxed.   The authorized capital stock is used only as a measure of taxation."   Still further paraphrasing this language, we are unable to perceive that it means anything other than if a state desires to impose an occupation tax upon a foreign corporation for the right to do a strictly domestic business within its limits, it may impose this license tax upon the capital stock of the corporation, because, notwithstanding that the tax is imposed upon the capital stock and thus upon property beyond the state's jurisdiction, the

supreme court of the United States will hold that the tax is valid, because it will say that in the last analysis the property itself is not taxed, but that the capital stock is used only as a "measure of taxation." Again we fail to perceive how every word of this might not equally well have been said in the Western Union Telegraph Company case, thus forcing the irresistible conclusion that the supreme court has receded from the position which it took, and has abandoned the views which it expressed in that and the like cases. But again, unfortunately, we are confronted in the same opinion with the declaration of the court that it has "no disposition to limit the authority of those cases." We are constrained to admit our inability to harmonize this language and these decisi⌐ns, though we make haste to add that undoubtedly the failure must come from our own deficient powers of perception and ratiocination, and for this deficiency it is no consolation to us to note that our brethren of the supreme court of Montana are similarly afflicted, for they, too, declare (*State ex rel.* v. *Alderson,* (Mont.) 140 Pac. 82) : "We are unable to appreciate the distinction attempted to be made by the supreme court of the United States between the Kansas statute considered in *Western Union Telegraph Co.* v. *Kansas,* and held to impose a general tax upon all the property of the company, and the statute of Massachusetts considered in *Baltic Mining Co.* and *S. S. White Dental Co.* v. *Commonwealth, of Massachusetts,* 231 U. S. 68, [58 L. Ed. 127, 34 Sup. Ct. Rep. 15], and held to be a mere excise."

We have said here, as well as in *Mulford Co.* v. *Curry,* that we sought to arrive at, and thought we had arrived at, the fundamental and governing principle of the decisions, which was that to tax the total capital stock of a corporation for the indicated purposes compelled the corporation paying the tax to submit to two unconstitutional burdens, and that while in dollars and cents the same charge might be imposed upon the corporation, this particular form of tax could not be permitted. It is apparent from the last decision of the supreme court that in some forms it *is* permitted, and only the supreme court of the United States can say what are the permitted forms. We have reached the point where, if it be *said* that the state occupation or privilege charge be an excise tax (and every one of them of necessity must be excise taxes) then it is not a property tax. And even if it be in terms a percentage tax

upon the capital stock of a corporation, if it be *said* that this is not a tax on the capital stock, but that the capital stock and *per centum* are taken as constituting merely a convenient measuring rod for fixing the tax, then 'the property is not taxed, and all constitutional objections are obviated.

Since these questions greatly affect the revenues as well as the rights of the states, since the determination of each one of them is to rest upon its facts, and since, in the event of a decision adverse to a state by its own courts, the state, because of a most unfortunate hiatus in the law, is deprived of a right of a review of the question by the supreme court of the United States, we are moved in the present condition of the decisions to hold and we do hold, that as to both of the license fees in question their payment is exacted as a privilege or occupation tax exclusively upon the right to do a domestic business within the state of California; that these taxes are excise taxes and not property taxes, and that the tax is not on, nor based on, the capital stock of the corporation, but is merely admeasured by that capital stock; that in every case, and so in this case, it is practicable (for what it may be worth) to segregate the strictly domestic business of a corporation from its interstate business; that the case of *Mulford Co.* v. *Curry* should no longer be regarded as an authority; that the respondent in this case should pay the fees prescribed by our law; that the general demurrer sustained to defendant and appellant's answer in the trial court should not have been sustained; that the judgment rendered in favor of respondent in the trial court should be reversed and the relief accorded it denied. And in conclusion we may add that if again we are mistaken, it is comforting to know that the doors of the supreme court of the United States are open for the correction of our error.

The judgment appealed from is therefore reversed, with directions to the trial court to proceed in accordance with the views herein expressed.

Shaw, J., Melvin, J., Lorigan, J., Sloss, J., Angellotti, J., and Sullivan, C. J., concurred.

Rehearing denied.