## PATTON *v.* BRADY, EXECUTRIX.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

No. 1. Argued December 6, 1901.—Decided March 17, 1902.

A case arises under the Constitution of the United States, when the right of either party depends on the validity of an act of Congress, which is the fact in this case.

In this case the cause of action survived the death of the defendant, and was rightfully revived in the name of his executrix.

The tax on manufactured tobacco is a tax on an article manufactured for consumption, and imposed at a period intermediate the commencement of manufacture and the final consumption of the article.

The tax which is levied thereby is an excise.

Taxation may run *pari passu* with expenditure, and the courts cannot revise the action of Congress in this respect.

A general tax may be charged upon property once charged with an excise; and the power to tax it as property, subject to constitutional limitations as to the mode of taxing property, is not defeated by the fact that it has already paid an excise.

The legislative determination as to the reasonableness of an excise in amount or as to the property to which it is applied, is final.

It is within the power of Congress to increase an excise, at least while the property is held for sale, and before it has passed into the hands of the consumer.

On July 14, 1899, plaintiff in error, as plaintiff below, commenced this action in the Circuit Court for the Eastern District of Virginia against J. D. Brady, collector of internal revenue for the second district of Virginia. In his declaration he alleged that in May, 1898, he had purchased in the open market and in the regular course of business 102,076 pounds of manufactured tobacco; that all the requisites of the internal revenue laws of the United States then existing had been fully complied with, stamps placed upon the boxes containing the tobacco, and regularly and duly canceled subsequent to April 14, 1898, and the tobacco removed from the factory, and that when he made his purchase the entire tax due the United States under and by virtue of such laws had been paid. The declaration then proceeded:

"After the act of Congress approved June 13, 1898, entitled 'An act to provide ways and means to meet war and other expenditures, and for other purposes,' had been enacted, the defendant, James D. Brady, who is the collector of internal revenue for the second district of the State of Virginia, in which he and plaintiff reside, and in the month of June, 1898, demanded of plaintiff that he pay the sum of $3062.28 as an additional tax to be paid upon said tobacco, which he claimed was imposed upon the same by the second paragraph of the third section of said act. Plaintiff refused to pay the same; whereupon the defendant threatened plaintiff that unless he did

pay it he would treat plaintiff as a delinquent, and would seize his property under the provisions of an act of Congress applicable to such case, and would sell the same. Under the coercion of this demand and threat plaintiff paid the sum of $3062.28 to the defendant, but he did so under protest and with notice to the defendant that he would sue him to recover it back.

"Plaintiff avers that said section 3 of said act of June 13, 1898, imposing said additional tax upon his tobacco is repugnant to the Constitution of the United States, and said acts of Congress authorizing the defendant to seize plaintiff's property and sell it if he did not pay the same are also repugnant to said Constitution, and that his suit therefore arises under the Constitution of the United States.

"On the 17th day of June, 1899, the plaintiff set out all of the foregoing facts in an application to the Commissioner of Internal Revenue of the United States, according to the laws in that regard and the regulations of the Secretary of the United States established in pursuance thereof, and he appealed to said Commissioner of Internal Revenue to have said money so unlawfully extorted from him returned to him; but said Commissioner of Internal Revenue on the — day of July, 1899, rejected said appeal and refused to direct said money to be returned to plaintiff. The said Commissioner did not reject said appeal because of any informality in the manner in which it was made, but because he was of opinion that said act of Congress imposing said tax was consistent with the Constitution of the United States, and that said tax was lawfully collected; by all of which acts and doings the plaintiff is damaged six thousand dollars, and therefore he sues."

Summons having been served the case came on for hearing on the motion of the United States attorney for the district to dismiss the action on the ground that the act of Congress set forth in the declaration was not repugnant to the Constitution of the United States, which motion was sustained, and on September 22, 1899, the action was dismissed. To review such ruling plaintiff sued out this writ of error.

*Mr. William L. Royall* and *Mr. Fred. Harper* for plaintiff in error. *Mr. John W. Daniel* was on their brief.

*Mr. Assistant Attorney General Beck* for defendant in error.

Mr. Justice Brewer, after making the above statement, delivered the opinion of the court.

The first contention of the defendant is that the Circuit Court did not have jurisdiction. The parties, it is true, were both citizens of Virginia, but the question presented in the declaration was the constitutionality of an act of Congress. The plaintiff's right of recovery was rested upon the unconstitutionality of the act, and that was the vital question. The Circuit Courts of the United States "have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity . . . arising under the Constitution or laws of the United States." Act of August 13, 1888, c. 866; 25 Stat. 433.

That a case arises under the Constitution of the United States when the right of either party depends on the validity of an act of Congress, is clear. It was said by Chief Justice Marshall that "a case in law or equity consists of the right of the one party, as well as of the other, and may truly be said to arise under the Constitution or a law of the United States whenever its correct decision depends on the construction of either," *Cohens* v. *Virginia,* 6 Wheat. 264, 379; and again, when "the title or right set up by the party may be defeated by one construction of the Constitution or law of the United States, and sustained by the opposite construction." *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 822. See also *Gold-Washing & Water Company* v. *Keyes,* 96 U. S. 199, 201; *Tennessee* v. *Davis,* 100 U. S. 257; *White* v. *Greenhow, Treasurer,* 114 U. S. 307; *Railroad Company* v. *Mississippi,* 102 U. S. 135, 139. In the latter case the following statement of the controversy was given in the opinion : " From this analysis of the pleadings, and of the petition for removal it will be observed that the contention of the State rests in part upon the ground that the construction and maintenance of the bridge in question is in violation of the condition on which Mississippi was admitted into the Union, and inconsistent with the engagement, on the

part of the United States, as expressed in the act of March 1, 1817. On the other hand, the railroad company, in support of its right to construct and maintain the present bridge across Pearl River, invokes the protection of the act of Congress passed March 2, 1868." And upon these facts it was held that the case was rightfully removed to the Federal court. Within these decisions obviously the Circuit Court had jurisdiction.

A second contention of the defendant is this: After the case had been brought to this court the defendant, J. D. Brady, died. Whereupon the plaintiff took steps to revive the action, and on November 4, 1901, Maggie A. Brady, the executrix of the deceased, was substituted as party defendant. Now it is insisted that the action was one based upon a tort, and, as such, abated by reason of the death of defendant.

Congress has not, speaking generally, attempted to prescribe the causes which survive the death of either party. Section 955, Rev. Stat., provides that—

"When either of the parties, whether plaintiff, or petitioner, or defendant, in any suit in any court of the United States, dies before final judgment, the executor or administrator of such deceased party may, in case the cause of action survives by law, prosecute or defend any such suit to final judgment."

This does not define the causes which survive. In the absence of some special legislation the question in each case must be settled by the common law or the law of the State in which the cause of action arose. *United States* v. *Daniel,* 6 How. 11; *Henshaw* v. *Miller,* 17 How. 212; *Schreiber* v. *Sharpless,* 110 U. S. 76; *Martin* v. *Baltimore & Ohio Railroad,* 151 U. S. 673; *Baltimore & Ohio Railroad Company* v. *Joy,* 173 U. S. 226, 229. It matters not whether we consider the common law or the statute law of Virginia as controlling. By either the cause of action stated in the complaint survived the death of defendant.

Section 2655 of the Code of Virginia (Code of 1887) reads as follows:

"An action of trespass or trespass on the case may be maintained by or against a personal representative for the taking or

carrying away any goods, or for the waste or destruction of or damage to any estate of or by his decedent."

The term "goods" is broad enough to include money, and as used in this statute must be held to be so inclusive, for it would be strange that a cause of action for taking and carrying away a thousand pieces of silver, should survive the death of the defendant, while a like action for taking and carrying away a thousand dollars in money should not. In *The Elizabeth and Jane*, 2 Mason, 407, 408, Mr. Justice Story said: "It cannot be doubted that money, and, of course, foreign coin, falls within the description of goods at common law." But more than that, the estate of plaintiff was reduced to the amount of three thousand dollars and over, by the action of decedent, and such reduction was a direct damage and comes within the rule laid down by the Court of Appeals in *Mumpower v. Bristol*, 94 Va. 737, 739, in which the court held that: "The damages allowed to be recovered by or against a personal representative by section 2655 of the code are direct damages to property, and not those which are merely consequent upon a wrongful act to the person only," and in which the presiding judge of the court, delivering the opinion and showing that the act sued for was not within the scope of the statute, said:

"The wrongful act which the defendant is alleged to have committed and for the injury resulting from which the plaintiff sues, consisted in maliciously and without probable cause suing out an injunction against the plaintiff, whereby the operation of his mill was suspended. It is quite obvious that this injunction did not operate to take or carry away the goods of the plaintiff, nor cause the waste or destruction of, or inflict any damage upon, the estate of the plaintiff. It is true that the language of the statute is comprehensive, and embraces damage of any kind or degree to the estate, real or personal, of the person aggrieved; but the damage must be direct, and not the consequential injury or loss to the estate which flows from a wrongful act directly affecting the person only. No part of the defendant's property was taken or carried away; no part of it was wasted or destroyed. The plaintiff's use of his property, and not the property itself, was affected by the act of which he complains."

See also *Ferrill* v. *Brewis' Adm'r*, 25 Gratt. 765, 770, and *Lee's Adm'r* v. *Hill*, 87 Va. 497.

If we turn to the common law, there the rule was that if a party increased his own estate by wrongfully taking another's property an action against him would survive his death, and might be revived against his personal representative. In the case of *United States* v. *Daniel*, 6 How. 11, which was an action against one who had in his lifetime been marshal of a district, to recover damages which the plaintiffs had sustained by reason of false returns made on certain executions by one of defendant's deputies, it was held that the action did not survive, because the decedent had received no benefit and had not increased his estate by means of the wrongful act. The court, referring to the common law, said:

" If the person charged has secured no benefit to himself at the expense of the sufferer, the cause of action is said not to survive; but where, by means of the offence, property is acquired which benefits the testator, there an action for the value of the property shall survive against the executor. . . . If the deputy marshal, in the misfeasance complained of, received money or property, the marshal being responsible for such acts, the cause of action survived against his executors. But this is not the case made in the present action."

Now the gravamen of the plaintiff's complaint is that he was compelled to pay the defendant the sum of $3062.28 to protect his property from unlawful seizure for illegal taxes. In such cases, having paid under protest, he can recover in an action of assumpsit the amount thus wrongfully taken from him.

" Appropriate remedy to recover back money paid under protest on account of duties or taxes erroneously or illegally assessed is an action of assumpsit for money had and received. Where the party voluntarily pays the money he is without remedy; but if he pays it by compulsion of law, or under protest, or with notice that he intends to bring suit to test the validity of the claim, he may recover it back, if the assessment was erroneous or illegal, in an action of assumpsit for money had and received." *Philadelphia* v. *The Collector*, 5 Wall. 720, 731. See also *Dooley* v. *United States*, 182 U. S. 222.

It is true there are one or two sentences in the declaration appropriate to an action sounding in tort, such as the one last quoted, in which the pleader alleges that "by all of which acts and doings the plaintiff is damaged $6000, and therefore he sues." But nevertheless the substance of the charge is that the defendant wrongfully took from plaintiff the sum of $3062.28. By virtue thereof there was an implied promise on the part of the defendant to repay the same, and that implied promise lies at the foundation of the action.

In *Schreiber* v. *Sharpless*, 110 U. S. 76, 80, it was said:

"The right to proceed against the representatives of a deceased person depends not on forms and modes of proceedings in a suit, but on the nature of the cause of action for which the suit is brought. . . . Whether an action survives depends on the substance of the cause of action, not on the forms of proceedings to enforce it."

And in *Lee's Adm'r* v. *Hill*, *supra*, the court observed (p. 500):

"The true test is, not so much the form of the action, as the nature of the cause of action. Where the latter is a *tort* unconnected with contract, and which affects the person only, and not the estate, such as assault, libel, slander and the like, there the rule *actio personalis*, etc., applies. But where, as in the present case, the action is founded on a contract, it is virtually *ex contractu*, although nominally in *tort*, and there it survives."

And also quoted the following from *Booth* v. *Northroy*, 27 Conn. 325 :

"In determining whether a cause of action survives to the personal representative, the real nature of the injury or claim ought to be regarded, and not the form of the remedy by which it is sought to be redressed or enforced."

For these reasons, and under these authorities, we are of opinion that this cause of action survived the death of the defendant, and was rightfully revived in the name of his executrix.

We pass, therefore, to consider the merits of the case, and here the first question is, what is the nature of the tax? Obviously it was intended by Congress as an excise.

In the chapter in the Revised Statutes on internal revenue,

section 3368, it was provided that " upon tobacco and snuff manufactured and sold, or removed for consumption or use, there shall be levied and collected the following taxes : " Then followed statements of the amounts of the prescribed taxes.   Section 30 of the Tariff Act of 1890, 26 Stat. 619, reads :

" That on and after the first day of January, eighteen hundred and ninety-one, the internal taxes on smoking and manufactured tobacco shall be six cents per pound, and on snuff six cents per pound."

On June 13, 1898, Congress passed an act to provide ways and means to meet the expenditures of the Spanish-American War, 30 Stat. 448.   Section 3, so far as is applicable, is as follows :

" SEC. 3. That there shall, in lieu of the tax now imposed by law, be levied and collected a tax of twelve cents per pound upon all tobacco and snuff, however prepared, manufactured and sold, for consumption or sale.   .   .   .

" And there shall also be assessed and collected, with the exceptions hereinafter in this section provided for, upon all the articles enumerated in this section which were manufactured, imported and removed from factory or customhouse before the passage of this act bearing tax stamps affixed to such articles for the payment of the taxes thereon, and canceled subsequent to April fourteenth, eighteen hundred and ninety-eight, and which articles were at the time of the passage of this act held and intended for sale by any person, a tax equal to one half the difference between the tax already paid on such articles at the time of removal from the factory or customhouse and the tax levied in this act upon such articles.

" Every person having on the day succeeding the date of the passage of this act any of the above described articles on hand for sale in excess of one thousand pounds of manufactured tobacco and twenty thousand cigars or cigarettes, and which have been removed from the factory where produced or the customhouse through which imported, bearing the rate of tax payable thereon at the time of such removal, shall make a full and true return, under oath, in duplicate, of the quantity thereof, in pounds as to the tobacco and snuff and in thousands as to the

cigars and cigarettes so held on that day, in such form and under such regulations as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may prescribe. . . ."

Ever since the early part of the civil war there has been a body of legislation, gathered in the statutes under the title Internal Revenue, by which, upon goods intended for consumption, excises have been imposed in different forms at some time intermediate the beginning of manufacture or production and the act of consumption. Among the articles thus subjected to those excises have been liquors and tobacco, appropriately selected therefor on the ground that they are not a part of the essential food supply of the nation, but are among its comforts and luxuries. The first of these acts, passed on July 1, 1862, 12 Stat. 432, in terms provided for "the collection of internal duties, stamp duties, licenses or taxes imposed by this act," and included manufactured tobacco of all descriptions. Subsequent statutes changed the amount of the charge, the act of 1890 reducing it to six cents a pound. Then came the act in question, which, for the purpose of providing means for the expenditures of the Spanish war, increased the charge to 12 cents a pound, specifying distinctly that it was to be "in lieu of the tax now imposed by law." Nothing can be clearer than that in these various statutes, the last included among the number, Congress was intending to keep alive a body of excise charges on tobacco, spirits, etc. It may be that all the taxes enumerated in these various statutes were not excises, but the great body of them, including the tax on tobacco, were plainly excises within any accepted definition of the term.

Turning to Blackstone, vol. 1, p. 318, we find an excise defined: "An inland imposition, paid sometimes upon the consumption of the commodity, or frequently upon the retail sale, which is the last stage before the consumption." This definition is accepted by Story in his Constitution of the United States, sec. 953. Cooley in his work on Taxation, page 3, defines it as "an inland impost levied upon articles of manufacture or sale, and also upon licenses to pursue certain trades, or to deal in certain commodities." Bouvier and Black, respec-

tively, in their dictionaries give the same definition.    If we turn to the general dictionaries, Webster's International calls it " an inland duty or impost operating as an indirect tax on the consumer, levied upon certain specified articles, as tobacco, ale, spirits, etc., grown or manufactured in the country.    It is also levied on licenses to pursue certain trades and deal in certain commodities."    The definition in the Century Dictionary is substantially the same, though in addition this is quoted from Andrews on Rev. Law, sec. 133 : " Excises is a word generally used in contradistinction to imposts in its restricted sense, and is applied to internal or inland impositions, levied sometimes upon the consumption of a commodity, sometimes upon the retail sale of it, and sometimes upon the manufacture of it."

Some of these definitions were quoted with approval by this court in the *Income Tax* cases, and while the phraseology is not the same in all, yet so far as the particular tax before us is concerned, each of them would include it.    The tax on manufactured tobacco is a tax on an article manufactured for consumption, and imposed at a period intermediate the commencement of manufacture and the final consumption of the article.

It is practically conceded by one counsel for plaintiff in error that this is an excise tax.    After discussing the question at some length he says :

" To determine then what excise means we have for our guidance, first, an enumeration of the articles that it fell on in Great Britain in 1787.    We have, second, the nature of the tax as judicially determined ; and we have, third, the definition of it, or the common understanding of men about it, as given by the Encyclopedia Britannica and the Century Dictionary.    Taking these three sources of information and combining them, it would seem that the leading idea of excise is that it is a tax, laid without rule or principle, upon consumable articles, upon the process of their manufacture and upon licenses to sell them.    .    .    .    Since tobacco was supposed to be one of the subjects to which excise was applied in England when the Constitution was framed, I shall assume that the court will hold that the tax in this case is an excise."

It is true other counsel in their brief have advanced a very

elaborate and ingenious argument to show that this is a direct tax upon property which must be apportioned according to population within the rule laid down in the *Income Tax* cases, but, as we have seen, it is not a tax upon property as such but upon certain kinds of property, having reference to their origin and their intended use.    It may be, as Dr. Johnson said, "a hateful tax levied upon commodities;" an opinion evidently shared by Blackstone, who says, after mentioning a number of articles that had been added to the list of those excised, "a list which no friend to his country would wish to see further increased."    But these are simply considerations of policy and to be determined by the legislative branch, and not of power, to be determined by the judiciary.    We conclude, therefore, that the tax which is levied by this act is an excise, properly so called, and we proceed to consider the further propositions presented by counsel.

It is insisted: "That Congress may excise an article as it pleases so that the excise does not amount to spoliation or confiscation.    But that having excised it, it has excised it, and the power is exhausted.    It cannot excise a second time."    But why should the power of imposing an excise tax be exhausted when once exercised?    It must be remembered that taxes are not debts in the sense that having once been established and paid all further liability of the individual to the government has ceased.    They are, as said in Cooley on Taxation, p. 1: "The enforced proportional contribution of persons and property, levied by the authority of the State for the support of the government and for all public needs," and so long as there exists public needs just so long exists the liability of the individual to contribute thereto.    The obligation of the individual to the State is continuous and proportioned to the extent of the public wants.    No human wisdom can always foresee what may be the exigencies of the future, or determine in advance exactly what the government must have in order "to provide for the common defence" and "promote the general welfare."    Emergencies may arise; wars may come unexpectedly; large demands upon the public may spring into being with little forewarning; and can it be, that having made provision for times

of peace and quiet, the government is powerless to make a further call upon its citizens for the contributions necessary for unexpected exigencies.

That which was possible in fact existed. A war had been declared. National expenditures would naturally increase and did increase by reason thereof. Provision by way of loan or taxation for such increased expenditures was necessary. There is in this legislation, if ever such a question could arise, no matter of color or pretence. There was an existing demand, and to meet that demand this statute was enacted. The question, therefore, is whether Congressional provision must reach through an entire year and at the beginning finally determine the extent of the burden of taxes which can be cast upon the citizen during that year, with the result that if exigencies arise during the year calling for extraordinary and unexpected expenses the burden thereof must be provided for by way of loan, temporary or permanent; or whether there inheres in Congress the power to increase taxation during the year if exigencies demand increased expenditures. On this question we can have no doubt. Taxation may run *pari passu* with expenditure. The constituted authorities may rightfully make one equal the other. The fact that action has been taken with regard to conditions of peace does not prevent subsequent action with reference to unexpected demands of war. Courts may not in this respect revise the action of Congress. That body determines the question of war, and it may therefore rightfully prescribe the means necessary for carrying on that war. Loan or tax is possible. It may adopt either, or divide between the two. If it determines in whole or in part on tax, that means an increase in the existing rate or perhaps in the subjects of taxation, and the judgment of Congress in respect thereto is not subject to judicial challenge. Wisely was it said by Mr. Justice Cooley in his work on Taxation, page 34:

"'The legislative makes, the executive executes, and the judiciary construes the laws.' Chief Justice Marshall, in *Wayman* v. *Southard*, 10 Wheat. 1, 46. The legislature must therefore determine all questions of state necessity, discretion or policy involved in ordering a tax and in apportioning it; must

make all the necessary rules and regulations which are to be observed in order to produce the desired returns, and must decide upon the agencies by means of which collections shall be made. 'The judicial tribunals of the State have no concern with the policy of legislation. That is a matter resting altogether in the discretion of another coördinate branch of the government. The judicial power cannot legitimately question the policy or refuse to sanction the provisions of any law not inconsistent with the fundamental law of the State.' Chief Justice Redfield, in *In re Powers,* 25 Vt. 261, 265. . . . But so long as the legislation is not colorable merely, but is confined to the enactment of what is in its nature strictly a tax law, and so long as none of the constitutional rights of the citizen are violated in the directions prescribed for enforcing the tax, the legislation is of supreme authority. Taxes may be and often are oppressive to the persons and corporations taxed; they may appear to the judicial mind unjust and even unnecessary, but this can constitute no reason for judicial interference."

In a general way these observations on the power of Congress to meet exigencies by increased taxation are not questioned by counsel, but it is specifically insisted that the power of imposing an excise once exercised is gone, even though the property may thereafter remain subject to ordinary taxation upon property as such. We quote the language of counsel:

" Possibly the property is not therefore to go free of taxation thereafter because it has been excised. If a man who has paid an excise upon a thousand boxes of tobacco chooses to stack it up in a warehouse and keep it there ten years, the tobacco is not, possibly, to go tax free because it has borne an excise. It receives the protection of the laws, and it should bear its part of the burdens of the laws. But it is to be taxed thereafter according to the principles of taxation, and not according to the arbitrariness of excise. Taxation upon it thereafter is to be direct taxation imposed according to population, which makes it bear a burden that is proportional to that borne by other property."

Doubtless a general tax may be cast upon property once charged with an excise; and the power to tax it as property,

subject to constitutional limitations as to the mode of taxing property, might not be defeated by the fact that it has already paid an excise.    But what is the difference in the nature of an excise and an ordinary property tax which forbids a repetition or increase in the one case and permits it in the other?    They are each methods by which the individual is made to contribute out of his property to the support of the government, and if an ordinary property tax may be repeated or increased when the exigencies of the government may demand, no reason is perceived why an excise should not also be repeated or increased under like exigencies.    Counsel speaks of the power to impose an excise as an arbitrary, unrestrained power, but the Constitution, art. 1, sec. 8, provides that " all duties, imposts and excises shall be uniform throughout the United States."    The exercise of the power is, therefore, limited by the rule of uniformity. The framers of the Constitution, the people who adopted it, thought that limitation sufficient, and courts may not add thereto.    That uniformity has been adjudged to be a geographical uniformity.    In the *Head-Money Cases*, 112 U. S. 580, 594, it was said :

" The tax is uniform when it operates with the same force and effect in every place where the subject of it is found.    The tax in this case, which, as far as it can be called a tax, is an excise duty on the business of bringing passengers from foreign countries into this, by ocean navigation, is uniform, and operates precisely alike in every port of the United States where such passengers can be landed.    .   .   .    Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream, as this court has said more than once.    (*State Railroad Tax cases*, 92 U. S. 575, 612.)    Here there is substantial uniformity within the meaning and purpose of the Constitution."

So also in the recent case of *Knowlton* v. *Moore*, 178 U. S. 41, 106 :

" By the result, then, of an analysis of the history of the adoption of the Constitution it becomes plain that the words ' uniform throughout the United States ' do not signify an intrinsic but simply a geographical uniformity.    And it also results

that the assertion to which we at the outset referred, that the decision in the *Head-Money Cases*, holding that the word uniform must be interpreted in a geographical sense, was not authoritative, because that case in reality solely involved the clause of the Constitution forbidding preferences between ports, is shown to be unsound, since the preference clause of the Constitution and the uniformity clause were, in effect, in framing the Constitution, treated as respected their operation, as one and the same thing, and embodied the same conception."

Geographical uniformity being therefore that only which is prescribed by the Constitution the courts may not add new conditions, and the statute in question fully complies with that requirement. It is not the province of the judiciary to inquire whether the excise is reasonable in amount, or in respect to the property to which it is applied. Those are matters in respect to which the legislative determination is final.

Neither can it be said that the change in the ownership of the tobacco in the case at bar had placed it beyond the reach of an excise. It is true that it had passed from the manufacturer, but it had not reached the consumer. By section 3 of the statute the charge is placed upon articles which "were at the time of the passage of this act held and intended for sale," and this tobacco was purchased and held for sale by the plaintiff. Within the scope of the various definitions we have quoted there can be no doubt that the power to excise continues while the consumable articles are in the hands of the manufacturer or any intermediate dealer, and until they reach the consumer.

Our conclusion, then, is that it is within the power of Congress to increase an excise as well as a property tax, and that such an increase may be made at least while the property is held for sale and before it has passed into the hands of the consumer; that it is no part of the function of a court to inquire into the reasonableness of the excise either as respects the amount, or the property upon which it is imposed.

The act in controversy, so far as the charge upon this plaintiff is concerned, is constitutional; and the judgment of the Circuit Court is

*Affirmed.*

Mr. Justice Harlan and Mr. Justice Gray took no part in the decision of this case.