SUCCESSORS OF C. & J. FANTAUZZI, PETITIONERS AND APPELLANTS, *v.* MUNICIPAL ASSEMBLY OF ARROYO, DEFENDANT AND APPELLEE.

APPEAL from the District Court of Guayama in Certiorari Proceedings.

No. 2558.—Decided April 28, 1922.

TAXES—MUNICIPAL TAXES—CONSTITUTIONAL LAW.—Considering the wording of subdivision (f) of section 49 and subdivision 4 of section 26 of the Municipal Law as amended by Act No. 9 of May 12, 1920, it is necessary to conclude that a special tax of six cents levied by a municipal assembly on each and every quintal of sugar manufactured in the municipality, to be used for improvements and public schools, is a lawful tax which, if necessary, may be considered as previously provided and defined by the Legislative Assembly of Porto Rico in accordance with section 3 of the Organic Act, which does

not require that each and every tax authorized must be expressly and specifically defined.

ID.—ID.—ID.—POWERS OF LEGISLATURE—DELEGATION OF POWERS.—Under sections 25, 37 and others of the Organic Act the Congress of the United States has invested the Legislature of Porto Rico with all the legislative powers consistent with a republican form of government that any State or Territory possesses and the only limitations on the power of the Legislature are the usual ones and those that are expressly contained in the Organic Act; therefore the right of the Legislature to bestow taxing powers upon the municipalities is not different from that of any other continental legislature, with only the limitations, if any, contained in section 3 of the Organic Act.

ID.—ID.—MANUFACTURE OF SUGAR.—A special tax of six cents levied by a municipal assembly on each and every quintal of sugar manufactured in the municipality is not a direct property tax, but is an excise tax that a municipality may lawfully impose under its general taxing power conferred by subdivision (f) of section 49 and subdivision 4 of section 26 of the Municipal Law.

ID.—ID.—ID.—LICENSE TAXES.—Independently of the municipal license tax that a municipality may impose upon a sugar factory for doing business, it may levy an excise tax on the manufacture of the sugar.

ID.—ID.—ID.—UNIFORM TAXES.—A municipal excise tax which is uniform throughout the municipality conforms to the requirements of the Organic Act as to uniformity of taxation.

ID.—ID.—ID.—MUNICIPAL ORDINANCE.—It can not be held that a municipal ordinance imposing a tax on the manufacture of sugar is void because its purpose is not clearly specified in its title when the title is as follows: ''An Ordinance to impose a special tax on every hundredweight of sugar manufactured in the municipality of Arroyo, Porto Rico, and for other purposes.''

ID.—ID.—ID.—ID.—A municipal ordinance is not void because passed by the assembly without having been first referred to a committee, particularly when it was passed unanimously.

ID.—ID.—ID.—ID.—A municipal ordinance imposing an excise tax of six cents on each and every hundredweight of sugar manufactured in the municipality for improvements and public schools can not be considered unreasonable unless the tax be shown to be confiscatory, or of such a great hardship that its unreasonableness would appear.

The facts are stated in the opinion.

*Mr. T. Bernardini* for the appellants.

*Mr. C. Domínguez Rubio* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

The Municipal Assembly of Arroyo passed an ordinance as follows:

''An Ordinance for imposing a special tax on every quintal of sugar manufactured in the Municipality of Arroyo, P. R., and for other purposes.

"Whereas, the Municipal Government of Arroyo, P. R., finds it necessary to devise ways and means for developing a plan of public improvements and constructing buildings suitable for school purposes for the better development and protection of public instruction;

"Therefore, be it resolved by the Municipal Assembly of Arroyo, P. R.:

"Section 1.—On and after the date on which this ordinance takes effect and during the remainder of the present sugar season of 1921 and subsequent seasons, a *special tax of six cents on each quintal of sugar* or fraction thereof is hereby levied and shall be collected by the municipal treasurer on all sugar manufactured in any sugar factory within this municipality. *Provided,* that the said tax shall be invariable while the market price of sugar does not exceed *five dollars* the quintal; but for each dollar or fraction of a dollar of increase above five dollars in the price of a quintal of sugar the said treasurer shall collect one and one-fourth cents additional.

"Section 2.—All factories engaged in the manufacture of sugar within the Municipality of Arroyo, P. R., shall present to the treasurer of this municipality within the first ten days of the month following that in which this ordinance takes effect and of each month thereafter until the termination of the present sugar season and subsequent seasons, exact statements of the number of quintals manufactured by each of them monthly.

"Section 3.—The statements referred to in the preceding section shall be made or presented under oath.

"Section 4.—The municipal treasurer of Arroyo, P. R., is hereby authorized, either personally or by any employee of his department, to investigate from time to time and ascertain whether the statements agree faithfully with the number of quintals of sugar manufactured by each factory.

"Section 5.—The money covered into the municipal treasury from these taxes shall be expended for public works and improvements. *Provided,* That fifty per cent of the total shall be used for the construction and enlargement of school buildings and one-tenth per cent shall be added to the ordinary municipal funds in order to increase the general items of expenses of the municipality.

"Section 6.—The council of administration of Arroyo, P. R., is hereby authorized to promulgate the necessary regulations for putting this ordinance into effect.

"Section 7.—Any person, partnership, association or corporation who violates the provisions of this ordinance, or causes them to be violated, or attempts to evade them by false propaganda or malicious insinuations, or by any other unlawful means, or furnishes false statements for the collection of the tax created by this ordinance, shall be prosecuted and upon conviction shall be fined not less than fifty dollars or imprisoned not less than fifteen days, or shall be both fined and imprisoned at the discretion of the court.

"Section 8.—All ordinances or resolutions in conflict with this ordinance are hereby repealed.

"Section 9.—This ordinance shall take effect as soon as it is approved and published in a newspaper of general circulation according to law.

"I certify that the foregoing ordinance was approved by the Municipal Assembly of Arroyo, P. R., by the affirmative vote of five of its members at its session of March 9, 1921, and that this is a true and exact copy of the original. I certify also that the said ordinance has been published in the newspaper called *El Mundo.* At the request of José M. Fantauzzi I issue this certified copy this first day of April, 1921, under the seal of this municipality.—Juan C. Dávila, Secretary of the Assembly.—Rodolfo Burgos, President."

The appellants, complaining of this ordinance, made an application to the District Court of Guayama for a writ of certiorari, which was issued. The petitioners set up, in substance, that they were a partnership and owners of a factory for manufacturing sugar known as the Central Lafayette; that the petitioners paid a license tax for the industry of manufacturing sugar; that the petitioners had paid taxes on $1,700,000, its volume of business, and are included in Group C of Act No. 26 of 1914, p. 176, laws of that year. Petitioners do not set forth that they are injured by the ordinance, but this was assumed both by the petitioners and by the court in rendering judgment. The court, in its judgment of the 26th of July, 1921, declared the ordinance in effect, one paragraph excepted. This exception has no bearing on the questions raised.

This case, along with a number of others that we shall

consider contemporaneously, involves a right of the municipality to impose taxes by virtue of the Municipal Law, as amended by Act No. 9 of May 12, 1920, and particularly section 49 of that law, although section 26 is also applicable.

"Section 49.—That the municipal revenues shall consist of:

"(a) The revenues and proceeds from municipal property;

"(b) The proceeds of any tax on real and personal property in the municipal district levied under proper authorization of the Legislative Assembly; *Provided*, That such property is not exempt from taxation by the laws of the United States or by any law enacted by the Legislative Assembly;

"(c) Any surcharge of the tax on taxable property of the municipality, provided it shall be so decided by two-thirds of the municipal assembly. Said surcharge shall not exceed one (1) per cent, computing therein any additional tax at present or hereafter authorized;

"Said surcharge shall be devoted solely to the redemption of loans heretofore or hereafter contracted; to the development of elementary education; to the construction of municipal or intermunicipal roads, aqueducts, electric plants, sewerage systems, construction of hospitals, cemeteries, asylums for the aged and orphans, tuberculosis sanatoriums, asylums for the insane and reform schools, market places, and to paving, asphalting and planting of trees on streets; docks and bulkheads, school houses and houses for teachers, agricultural farms; houses for sale on long terms to workmen, the erection of villages, dikes to prevent inundations, public laundries, and buildings for municipal offices. Said property sur-tax shall be collected by the Treasurer of Porto Rico, a certified copy of the ordinance adopted by the municipal assembly to serve as authorization for the purpose. This sur-tax shall be levied on the basis of the assessment made by the Department of Finance, for collection solely during the following fiscal year, except in cases of loans, when it shall be in force for the time necessary until payment of the principal and interest shall have been covered. In all cases, the surcharge shall not be collected in the same fiscal year in which it was levied by the municipal assembly; *Provided*, That the municipal ordinance levying any additional taxes on the assessment of property shall be received by the Treasurer of Porto Rico on or before the 15th of March.

"(d) License taxes provided by Act No. 26 of March 28, 1914, entitled 'An Act authorizing the municipalities of the Island of Porto Rico to levy and collect annual license taxes to be used in meeting their budgetary expenses, and for other purposes,' which is hereby declared to be in force;

"(e) Fines and costs imposed by peace courts;

"(f) Any other impost, excise or tax that may be levied by two-thirds of the members of the municipal assembly, provided the object or matter of taxation is not also the object or matter of any federal or insular tax.

"(g) Interest on deposits of funds.

"*Provided*, That municipalities may reimburse totally or partially any funds unduly or unlawfully covered into the municipal treasury, whatever the source of such funds, by resolution to that effect adopted by the municipal assembly or by the council of administration, when the former is not in session."

"Section 26.—That the municipal assembly shall have sole authority:

"1. To frame the budget of receipts and expenditures;

"2. To sell, exchange, encumber or lease municipal property, and to construct theatres; *Provided*, That the council of administration may authorize the leasing of municipal theatres for a term not greater than sixty (60) days;

"3. To authorize loans;

"4. To levy taxes and excise taxes of any kind;

　　　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　''

We have selected this case for our principal discussion because the brief is in best legal form and presents the most complete attack on the right of a municipality to adopt this kind of an ordinance, or to impose this kind of a tax. We shall, however, discuss the errors in a somewhat different order than the one presented in the assignment.

1. The first alleged error that we shall consider is No. 4 in the appellants' assignment, as follows:

"The court erred in not finding that the purpose and matter of the ordinance complained of herein had not been 'provided and defined' by the Legislature."

The appellants maintain that the municipality had no

right to impose this tax, because it was not previously "provided and defined" by the Legislature of Porto Rico. This supposed limitation is to be found in section 3 of the Organic Act:

"Section 3.—That no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the Insular and Municipal Governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal govermnent therein as may be provided by law, and to protect the public credit; *Provided, however,* That no public indebtedness of Porto Rico or of any subdivision or municipality thereof shall be authorized or allowed in excess of seven per centum of the aggregate tax valuation of its property, and all bonds issued by the Government of Porto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Porto Rico or of any political or municipal subdivision thereof, or by any State, or by any county, municipality, or other municipal subdivision of any State or Territory of the United States, or by the District of Columbia. In computing the indebtedness of the people of Porto Rico, bonds issued by the people of Porto Rico secured by an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted."

The appellants say:

"In our opinion what the Congress of the United States sought to avoid is that the Legislature of Porto Rico should delegate to the Treasurer of Porto Rico, or to any other organism of the Insular Government, or to the municipalities, the power to impose taxes upon objects, matters, properties or articles of commerce which have not been previously specified or provided and defined by the Legislature itself."

In case No. 2507 the District Court of San Juan said:

"Referring only to the power to impose taxes, said section 3 of our Organic Act authorizes the Legislature to *provide* and *define*

taxes and assessments for the purposes of the Insular and Municipal Governments. In a word, any tax that a municipality may desire to impose must be previously provided and *defined* by the Legislature of Porto Rico. And not only has that been the law since the enactment of the Jones Act, but it was the law under the Foraker Act. In section 1869 of the Revised Statutes of Porto Rico the Legislature authorized the municipalities to derive their revenues from certain enumerated sources, provided that 'no taxes, imposts or excises other than those herein enumerated shall be levied by a municipality, unless expressly authorized by this act, or by the laws of Porto Rico.' Subsequently, by the Act of 1914 authorizing the levy of certain internal revenue taxes, express authorization was given to the municipalities to collect the taxes clearly defined.

''We think, therefore, that the power granted under paragraph (*f*) of section 49 of the new Municipal Law for the collection of 'any other impost, excise or tax that may be levied by two-thirds of the members of the municipal assembly, provided the object or matter of taxation is not also the object or matter of any federal or insular tax,' is subordinate to the general principle recognized by the Legislature prior to the enactment of the Jones Act and expressly reaffirmed in section 3 thereof, to the effect that such tax or assessment 'must be *provided* and *defined* by the Legislature of Porto Rico.' The tax of ten cents on each 100 weight of sugar provided for by the Municipality of Carolina has not been provided or defined by the Legislature of Porto Rico. No other definition will express it, inasmuch as to define is to determine, to fix, to describe, to characterize, to distinguish with exactness and accuracy.''

We agree with the appellant in No. 2507, where the decision was against the tax, that a power of taxation may be completely provided and defined by the Legislature without a specific, express enumeration of the taxes authorized. Section 3 of the Organic Act, *supra,* does not say, as suggested, that each and every tax to be imposed must be expressly and specifically defined. If I say to a man that I want to reserve to myself certain rooms in my house, but that he is free to occupy and possess any other part of that house, it is a complete definition and provision of the part of the house he is to occupy. There is no way known to

us in logic or legislation that is more exhaustive of the field
to be covered than a similar residuary provision, and this
to a certain extent was the method of the Organic Act with
regard to taxation, inasmuch as in section 3 a prohibition
was first placed on our Legislature by Congress and the rest
of the field left open. There is no mistaking the territory
to be covered. By section 49 (*f*) the municipality is forbid-
den to impose any tax previously imposed by the national
or insular governments, but it is free to impose any other
tax. Whether this is a wise provision of the Legislature is
not a subject of judicial inquiry, provided the right to dele-
gate the power of taxation to municipalities exists. *Patton*
v. *Brady,* 184 U. S. 608, *post; State* v. *Irvin,* 35 S. E. 430.;
*State* v. *Worth,* 21 S. E. 204. The authority to confer the
power of taxation on municipalities within constitutional
limits is practically unquestioned. The right has always
existed and it springs from the necessities of the situation.
19 R. C. L. 943 *et seq.;* 28 Cyc. 1658 *et seq.; Henderson
Bridge Co.* v. *Henderson,* 173 U. S. 592, 37 Cyc. 725; note
*Mayor, Etc., of Baltimore* v. *State,* 74 A. D. 592.

To revert to the construction of section 3 of the Organic
Act. It is urged, citing the opinion of a judge of the United
States District Court for Porto Rico in the case of *Societé
Anonime Des Sucreries de Saint Jean* v. *Caldas,* decided
April 23, 1921, that the plan of the Jones Act was incon-
sistent with the extension of local self-government in mat-
ters of taxation by the municipality. We have read the Or-
ganic Act with great care. Section 25 provides:

"That all local legislative powers in Porto Rico, except as herein
otherwise provided, shall be vested in a Legislature which shall con-
sist of two houses, one the Senate and the other the House of Repre-
sentative, and the two houses shall be designated 'the Legislature
of Porto Rico.'"

Section 37 is as follows:

"That the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable, including power to create, consolidate, and reorganize the municipalities so far as may be necessary, and to provide and repeal laws and ordinances therefor; also the power to alter, amend, modify, or repeal any or all laws and ordinances of every character now in force in Porto Rico or municipality or district thereof in so far as such alteration, amendment, modification, or repeal may be consistent with the provisions of this Act. No executive department not provided for in this Act shall be created by the Legislature, but the Legislature may consolidate departments, or abolish any department, with the consent of the President of the United States."

It seems to us that under these sections and others the Congress of the United States has invested the Legislature of Porto Rico with all the legislative powers consistent with a republican form of government that any State or Territory possesses, and that the only limitations on the power of the Legislature are the usual ones and those that are expressly contained in the Organic Act. The Supreme Court of the United States in *Christianson* v. *King County,* 239 U. S. 356, 365, considering the right to make laws of escheat by the former Territory of Washington, said that subject to the restrictions contained in the Organic Act, the territorial legislatures have generally been entrusted with the enactment of entire systems of municipal law. Our Organic Act is as broad with regard to the legislative power as any other territorial act. The right of our Legislature to bestow taxing powers upon the municipalities is, then, no different from that of any other legislature, unless such limitation is found in section 3 itself. Throughout the Act we find nothing restrictive of the right of the Legislature to invest the municipality with such powers of taxation as the Legislature deems fit. There is no evidence of a contrary intent, unless revealed by section 3, and if the conclusion to be established is that section 3 is restrictive by reason of the general spirit of the Jones Act, that section can not be used as a premise to prove

the conclusion. The words of that section must be read and understood by the ordinary canons of interpretation.

The appellants attempt to prove too much. We understand section 3 of the Organic Act as conferring on the Legislature the general power of taxation and of borrowing, and as giving the Legislature the right to govern the matter of municipal taxation. We find therein no restriction in the kind of taxation, except so far as export taxes are concerned. If section 3 is read as a restriction or limitation, it would seem to be imposing, not a limitation on the right of a municipality to tax, but on the power of the Legislature itself. Too closely read, there is nothing in section 3 that expressly says that the Legislature should previously define the taxing power of a municipality. It says that various taxes, naming them, may be imposed for the "purposes" of the Insular and Municipal governments as may be provided and defined by the Legislature of Porto Rico, but as only the Legislature can impose insular taxes and as the Legislature can and does impose taxes for municipal purposes, we would then have to take it that Congress here was speaking only of the legislative act by the Insular Legislature. We should have to look elsewhere than to section 3 to find any reference to the power of taxation that resides in the municipalities themselves, or that may be conferred. Section 3 would then have to be read as saying that taxes for municipal purposes could only be imposed by the Legislature, a manifestly absurd conclusion, for it is conceded on all sides that within certain restrictions the Legislature may empower the municipality to impose taxes. Taking, then, the general spirit of the Act providing a Civil Government for Porto Rico and the specific provision of section 37, *supra,* the power of the Legislature over a municipality is as complete as such power normally could be, and we find nothing in section 3 that would prevent the Legislature from giving the municipality for local pur-

poses all the powers of taxation that it did not reserve for itself.

That legislatures can and do confer general powers of taxation on property within their territory or municipalities, the following citations will show: *Youngerman* v. *Murphy,* 107 Iowa, 686, 76 N. W. 648.

In *State* v. *Irvin,* 35 S. E. 430, a charter gave the town the same general power of taxation as was possessed by the general assembly and the court decided that the charter was not repugnant to the constitution forbidding any taxes by municipalities except for necessary purposes, unless by vote of majority, etc., and the court held that the burden was on the one attacking the taxing power to show that the taxation was not necessary; and in *State* v. *Worth,* 21 S. E. 304, *supra,* it was said:

"When the power delegated to a city or town is abused in this respect, the Legislature may restrict their discretional authority by fixing a maximum or a minimum limit for any or all of the subjects specifically taxed, but they have not done so and we see no evidence of abuses of power, if we had authority to correct or remedy such a wrong."

See also section 360 of the Political Code. The fact that the Legislature has previously been more guarded as to municipal taxation can not affect the question of power.

2. Appellants maintain that the court erred in saying that the tax sought to be laid was an excise tax. This was the first error assigned. Appellants insist that this is a property tax. Now, if a municipality in Porto Rico imposes a property tax, there would seem to be no objection to it, unless the field had been previously covered by the Legislature. Section 49 (*f*) of the laws of 1920, *supra.* All the cases that appellants cite and all the argument assume that if the tax laid by the municipality is a property tax it is illegal. The reason generally why this distinction is insisted on in the United States is because of constitutional provi-

sions that direct taxes must be uniform throughout the United States. Therefore the courts have attempted to define what is a direct tax, what is a property tax, and the like, and the decisions exclude excise taxes from the field of direct taxes. There is no objection to a uniform property tax imposed by the right authorities. The question of uniformity and the alleged inconsistency with insular legislation in regard to taxes are discussed in another part of the appellants' brief.

However, that the tax in question is an *excise* we have no doubt. Counsel for the appellants insists that an excise tax is always an exercise of the police power. We question this in passing and refer counsel to the following authorities: *Rosenbloom* v. *State*, 89 N. W. 1060; 26 R. C. L. 17; Cooley on Taxation, Vol. 2, p. 1095. We gather that excises may be imposed under the general taxing power. We need not discuss the matter at greater length, because, as a supposed exercise of police power, no objection to the tax was raised.

As a point of departure for a discussion of the nature of this tax, we shall consider the most analogous case discussed by appellant, *Thompson* v. *McLeod*, L. R. A. 1918 C, 893. Mississippi put a law on its statute books requiring all persons pursuing the business of extracting turpentine from standing trees to pay an annual privilege or occupation tax. The court held that this was a property tax and in violation of the statutory provision that property should be taxed in proportion to its value. Two judges dissented on the ground, in effect, that the Legislature must have meant what it said when it defined the tax as an occupation or privilege tax, and these judges maintained that it applied only to those who made the extraction of turpentine a business or occupation. In other words, that the law did not apply to those who merely extracted the turpentine as one would pick apples from trees. The court, however, among other reasons, sustained the objection to the tax on the ground that, as a rule, within the State of Mississippi the effect of

the Act would be a tax on the crude product and indistinguishable from other raw products, and that the Act was an imposition of a property tax. The court said that there was no well-defined business in Mississippi of buying and selling crude turpentine. The essence of the decision was that there was no business involved. The owning and operating of a sugar mill is to engage in business. And the tax on sugar is not imposed on the raw product.

*Patton v. Brady,* 184 U. S. 608, cited by counsel on both sides of this question, is a leading case on the nature of excise taxes. The tax in question was on manufactured tobacco. The court said:

"Ever since the early part of the Civil War there has been a body of legislation, gathered in the statutes under the title Internal Revenue, by which, upon goods intended for consumption, excises have been imposed in different forms at some time intermediate the beginning of manufacture or production and the act of consumption. Among the articles thus subjected to those excises have been liquors and tobacco, appropriately selected therefor on the ground that they are not a part of the essential food supply of the nation, but are among its comforts and luxuries. The first of these acts, passed on July 1, 1862, 12 Stat. 432, in terms provided for 'the collection of internal duties, stamp duties, licenses or taxes imposed by this act,' and included manufactured tobacco of all descriptions. Subsequent statutes changed the amount of the charge, the Act of 1890 reducing it to six cents a pound. Then came the act in question, which, for the purpose of providing means for the expenditures of the Spanish War, increased the charge to twelve cents a pound, specifying distinctly that it was to be 'in lieu of the tax now imposed by law.' Nothing can be clearer than that in these various statutes, the last included among the number, Congress was intending to keep alive a body of excise charges on tobacco, spirits, etc. It may be that all the taxes enumerated in these various statutes were not excises, but the great body of them, including the tax on tobacco, were plainly excises within any accepted definition of the term.

"Turning to Blackstone, vol. 1, p. 318, we find an excise defined: 'An inland imposition, paid sometimes upon the consumption of the

commodity, or frequently upon the retail sale, which is the last stage before the consumption.' This definition is accepted by Story in his Constitution of the United States, sec. 953. Cooley in his work on Taxation, page 3, defines it as 'an inland impost levied upon articles of manufacture or sale, and also upon licenses to pursue certain trades, or to deal in certain commodities. Bouvier and Black, respectively, in their dictionaries give the same definition. If we turn to the general dictionaries, Webster's International calls it 'an inland duty or impost operating as an indirect tax on the consumer, levied upon certain specified articles, as tobacco, ale, spirits, etc., grown or manufactured in the country. It is also levied on licenses to pursue certain trades and deal in certain commodities.' The definition in the Century Dictionary is substantially the same, though in addition this is quoted from Andrews on Rev. Law, sec. 133: 'Excises is a word generally used in contradistinction to imposts in its restricted sense, and is applied to internal or inland impositions, levied sometimes upon the consumption of a commodity, sometimes upon the retail sale of it, and sometimes upon the manufacture of it.'

"Some of these definitions were quoted with approval by this court in the Income Tax cases, and while the phraseology is not the same in all, yet so far as the particular tax before us is concerned, each of them would include it. The tax on manufactured tobacco is a tax on an article manufactured for consumption, and imposed at a period intermediate the commencement of manufacture and the final consumption of the article.

"It is practically conceded by one counsel for plaintiff in error that this is an excise tax. After discussing the question at some length he says:

" 'To determine then what excise means we have for our guidance, first, an enumeration of the articles that it fell on in Great Britain in 1787. We have, second, the nature of the tax as judicially determined; and we have, third, the definition of it, or the common understanding of men about it, as given by the Encyclopedia Britannica and the Century Dictionary. Taking these three sources of information and combining them, it would seem that the leading idea of excise is that it is a tax, laid without rule or principle, upon consumable articles, upon the process of their manufacture and upon licenses to sell them. * * * Since tobacco was supposed to be one of the subjects to which excise was applied in

England when the Constitution was framed, I shall assume that the court will hold that the tax in this case is an excise.'

"It is true other counsel in their brief have advanced a very elaborate and ingenious argument to show that this is a direct tax upon property which must be apportioned according to population within the rule laid down in the Income Tax cases, but, as we have seen, it is not a tax upon property as such, but upon certain kinds of property, having reference to their origin and their intended use. It may be, as Dr. Johnson said, 'a hateful tax levied upon commodities;' an opinion evidently shared by Blackstone, who says, after mentioning a number of articles that had been added to the list of those excised, 'a list which no friend to his country would wish to see further increased.' But these are simply considerations of policy and to be determined by the legislative branch, and not of power, to be determined by the judiciary. We conclude, therefore, that the tax which is levied by this act is an excise, properly so called, and we proceed to consider the further propositions presented by counsel.

"It is insisted: 'That Congress may excise an article as it pleases so that the excise does not amount to spoliation or confiscation. But that having excised it, it has excised it, and the power is exhausted. It can not excise a second time.' But why should the power of imposing an excise tax be exhausted when once exercised? It must be remembered that taxes are not debts in the sense that having once been established and paid all further liability of the individual to the government has ceased. They are, as said in Cooley on Taxation, p. 1: 'The enforced proportional contribution of persons and property, levied by the authority of the State for the support of the government and for all public needs,' and so long as there exists public needs, just so long exists the liability of the individual to contribute thereto. The obligation of the individual to the State is continuous and proportioned to the extent of the public wants. No human wisdom can always foresee what may be the exigencies of the future, or determine in advance exactly what the government must have in order 'to provide for the common defense' and 'promote the general welfare.' Emergencies may arise; wars may come unexpectedly; large demands upon the public may spring into being with little forewarning; and can it be, that having made provision for times of peace and quiet, the government is powerless

to make a further call upon its citizens for the contributions necessary for unexpected exigencies.

"That which was possible in fact existed. A war had been declared. National expenditures would naturally increase and did increase by reason thereof. Provision by way of loan or taxation for such increased expenditures was necessary. There is in this legislation, if ever such a question could arise, no matter of color or pretence. There was an existing demand, and to meet that demand this statute was enacted. The question, therefore, is whether congressional provision must reach through an entire year and at the beginning finally determine the extent of the burden of taxes which can be cast upon the citizen during that year, with the result that if exigencies arise during the year calling for extraordinary and unexpected expenses the burden thereof must be provided for by way of loan, temporary or permanent; or whether there inheres in Congress the power to increase taxation during the year if exigencies demand increased expenditures. On this question we can have no doubt. Taxation may run pari passu with expenditure. The constituted authorities may rightfully make one equal the other. The fact that action has been taken with regard to conditions of peace does not prevent subsequent action with reference to unexpected demands of war. Courts may not in this respect revise the action of Congress. That body determines the question of war, and it may therefore rightfully prescribe the means necessary for carrying on that war. Loan or tax is possible. It may adopt either, or divide between the two. If it determines in whole or in part on tax, that means an increase in the existing rate or perhaps in the subjects of taxation, and the judgment of Congress in respect thereto is not subject to judicial challenge. Wisely was it said by Mr. Justice Cooley in his work on Taxation, page 34:

" 'The legislative makes, the executive executes, and the judiciary construes the laws.' Chief Justice Marshall, in Wayman v. Southard, 10 Wheat. 1, 46. The legislature must therefore determine all questions of state necessity, discretion or policy involved in ordering a tax and in apportioning it; must make all the necessary rules and regulations which are to be observed in order to produce the desired returns, and must decide upon the agencies by means of which collections shall be made. 'The judicial tribunals of the State have no concern with the policy of legislation.' That

is a matter resting altogether in the discretion of another coordinate branch of the government. The judicial power can not legitimately question the policy or refuse to sanction the provisions of any law not inconsistent with the fundamental laws of the State.' Chief Justice Redfield, in In re Powers, 25 Vt. 261, 265. * * * But so long as the legislation is not colorable merely, but is confined to the enactment of what is in its nature strictly a tax law, and so long as none of the constitutional rights of the citizen are violated in the directions prescribed for enforcing the tax, the legislation is of supreme authority. Taxes may be and often are oppressive to the persons and corporations taxed; they may appear to the judicial mind unjust and even unnecessary, but this can constitute no reason for judicial interference.' ''

In 26 R. C. L., 236, we find the following:

''EXCISE DEFINED:—An excise is a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege. Every form of tax not imposed directly upon polls or property must constitute an excise if it is a valid tax of any description. A tax purporting to be levied as an excise may be open to either of two constitutional objections: (1) that it is a property tax and not an excise, and if in conflict with the constitutional limitations which rest upon property taxes is void; (2) that it is not within the constitutional power of taxation in any form. As to the first objection it appears to be well settled that the mere right to own and hold property can not be made the subject of an excise, and that since the right to derive income from property is the chief attribute of ownership, the act or privilege of receiving income from property can not be made the subject of an excise. So also it has been held that the exercise of the right to devote property to the only use for which it is available is in effect a tax on such property and can not be made the subject of an excise and for this reason a tax can not be imposed upon the act of gathering fruit from one's own trees or crops from one's own land. On the other hand the use of property of certain classes, especially luxuries, has always been considered a proper subject of excise. Thus a tax on the use of carriages was imposed in some of the colonies even prior to the Revolution, and a similar tax imposed by the United States in 1794 was sustained after much discussion as

a valid excise. So also taxes on the use of billiard tables even by the owner for his own amusement have not been uncommon and have been everywhere sustained. The license taxes on automobiles, from which almost every state derives a substantial revenue, are a modern example of the same sort of tax. So also it has been held that a tax on the use of foreign built yachts is a valid excise. It is not ownership which is the subject of the tax, but the election during the taxing period of the owner to take advantage of one of the elements which are involved in ownership, namely, the right to use.''

And in foot notes, among others, the following cases are cited: *Pollock* v. *Farmers Loan & Trust Co.,* 157 U. S. 429; *Billings* v. *United States,* 232 U. S. 261. The first, the Income Tax case, discusses the nature of a direct tax and holds, to a certain extent by exclusion, what is an excise tax; also that a tax on use like a carriage was an excise tax. *Fulton* v. *United States,* 3 Dallas, 171. Likewise on the business of an insurance company. And that succession taxes were excises, etc. An income tax was direct. In the second case the court sustained that a tax on a foreign-built vessel was clearly intended to be on the use as distinguished from ownership and hence was an excise. Some of the cases are on very narrow lines, but we find no case has decided that a tax on manufacturing or selling is a so-called property tax. On the contrary, occupation, manufacturing and privilege taxes are excises. A tax on the intrastate business of a foreign corporation was held to be an excise. *Pick* v. *Jordan,* 169 Cal. 1, subsequently affirmed by the Supreme Court of the United States. Indirectly, as shown in this case and in others, an excise frequently or ultimately falls on property, but taxes on business, occupations or manufacturing are not property taxes as defined by the economists or the courts.

A closely related case was *Sugar Refining Co.* v. *McClain,* 192 U. S. 397, where it was held that the tax imposed upon the gross annual receipts in excess of $250,000 of any cor-

poration or company carrying on or doing business of refining sugar was an excise and not a direct tax.   Mr. Justice
Harlan reviewed the cases p. 412, including *Patton* v. *Brady,
supra,* to show this.   Of interest too is the case of *Stratton's
Independence* v. *Howbert,* 231 U. S. 399, 415, where the court
showed that ore taken out of a mine underwent a process
similar to manufacture, a conversion of realty into personalty.   And see also the cases cited on page 414 of that
opinion.

3. The appellants say that the court erred in not finding,
supposing a tax to be an excise, that the appellant had
already paid a license tax to the Insular Treasury.   We
rather thought that it was the municipalities who now impose license taxes, although we are aware that at times it
has been the Insular Legislature, but supposing the appellants to mean the general law by which municipalities are
authorized to impose license taxes and that this was the law
of the Legislature, the question arises whether the particular
tax sought to be imposed is covered by the license tax already paid by the appellants.   At first blush there might
appear to be some force in this assignment, were it not for
the fact that the economists and the courts distinguish between a general business tax and a tax placed on the manufacture of an article.   It is clearly pointed out in various
authorities that a general tax on the doing of business and
a tax on manufactures are two different forms of excise taxes.
Hence, if there is nothing in the general law that would
prevent an additional tax by the Legislature, for example,
on manufactures in Porto Rico generally, so may the municipality too under its general draft of power.   *Patton* v.
*Brady, supra; McHenry* v. *Alford,* 168 U. S. 651, 669; *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459.   That there is no
objection to the tax as double see *Nebraska Telephone Co.*
v. *City of Lincoln,* 28 L. R. A., N. S. 221; *People* v. *Garzot,*

24 P. R. R. 215. We make the following quotation from 2 Cooley on Taxation, pp. 1095-6:

"The methods in which business shall be taxed are also in the legislative discretion. The taxes which are most customary are: 1. On the privilege of carrying on the business.—2. On the amount of business done.—3. On the gross profits of the business.—4. On the net profit or profits divided. But the tax may be measured by other standards prescribed for the purpose as well as by these.

"It has been seen that it is no conclusive objection to any such tax that it duplicates the burden to the person who pays it. To tax a merchant upon his stock as property, and also upon his gross sales, may seem burdensome, but it is not unconstitutional when the people have not seen fit expressly to forbid it. The two taxes are not identical, and though it may operate unjustly in individual cases to impose both, such will not be a necessary result; and it is always to be presumed that all the burdens of taxation have been distributed by the legislature with due regard to equality in the final results of collection. A tax, therefore, which at first blush appears to be invidious and partial may nevertheless in its ultimate results prove to be just and equal as any."

4. The appellants raise the question of uniformity and say that the Organic Act requires that uniformity should be the rule in Porto Rico. The question is definitely settled that uniformity is a matter of geography, and that a national tax must be uniform throughout the nation, a state tax must be uniform throughout the state and a municipal tax or a county tax must be uniform throughout the municipality or the county. *Knowlton* v. *Moore*, 178 U. S. 41, 83 *et seq.*, and citations; 26 R. C. L. 247; 37 Cyc. 733 *et seq.* The fact that different municipalities might impose different taxes has been met and disposed of by the said authorities.

5. In the third error the appellants say that that the ordinance is void because its title does not clearly specify the object of the law. The title was: "An ordinance to impose a special tax on every hundredweight of sugar manufactured

in the Municipality of Arroyo, Porto Rico, and for other purposes.'' This would seem to be clear enough, and we base our decision on that point.

Appellants insist that under section 23 of the Municipal Law the municipalities are required to follow the same rules as set out in section 34, paragraph 8, of the Organic Act with regard to the Legislative Assembly. Section 23 provides that all limitations imposed by the Organic Act of Porto Rico on the Legislature and its members shall be applicable as far as possible to the municipal assembly and the members thereof. This section finds its place in a municipal law in between a number of other sections relating to the election of members of the municipal assembly, their pay, etc. We do not think the Legislature, in passing this law, had at all in mind the question of a form or the manner of passing municipal ordinances, but if we were in doubt about this we should say that the words ''as far as possible'' would exclude the idea that a municipality, in passing these ordinances, should be put to all the formalities of a legislature.

6. Similar considerations apply to the alleged final assignment of error which sets forth that the municipality did not follow the rules required for the passing of an ordinance. We agree with the appellee that as the municipality passed this ordinance unanimously, such unanimity would cure any defect in regard to the alleged failure to refer the resolution first to a committee. While the municipal laws show that there are such committees in municipal legislatures, until we are otherwise more strongly convinced we do not find that a municipality should be required to refer every ordinance to a committee. Very frequently, differently from a legislature, a municipality is required to act immediately. It would be against the spirit of our laws in general to require great formalities in the passage of an ordinance.

7. The only other assignment of error is that the ordi-

nance is unreasonable. This was No. 6 of appellants' assignment of errors. Some of these questions of unreasonableness go to the wisdom of the ordinance, which, as we have previously intimated, is a matter for the Legislature and not for the courts. Almost everything else that could be thought of to show that this ordinance is unreasonable would put a burden on the appellants that they have not met. This burden would be to show that the tax in question was confiscatory, or of such a great hardship that its unreasonableness would appear. We do not find that the appellants met this burden. Nor did they show that the amount of taxation exceeded the true financial rate limit fixed by the Organic Act, section 37, if the words of that section refer to an excise tax. It would not be enough either, as suggested, to assert that this tax falls solely on the appellants if the appellants in a sugar country have the only mill in the municipality grinding cane.

8. Some of the general considerations of the appellants apply to the fact that the purposes for which the tax was imposed were not shown to be necessary, but a tax for more schools or for the improvement of schools is one of the most favored of municipal taxation. An interesting case on this subject is *Larue* v. *Redmon*, 182 S. W. 622.

The judgment must be

*Affirmed.*

Chief Justice Del Toro and Justices Aldrey and Hutchison concurred.

Mr. Justice Franco Soto took no part in the decision of this case.