November 6, 1978

## 78-59 MEMORANDUM OPINION FOR THE SPECIAL REPRESENTATIVE FOR TRADE NEGOTIATIONS

### Constitutional Law—U.S. Tariffs and Customs— Procedures for Levying *ad valorem* Rates of Customs Duties—Cost-Insurance-Freight (CIF) Customs Valuation System

The Attorney General has asked this Office to respond to your request for our opinion regarding the constitutionality of a contemplated adoption of a CIF ("cost-insurance-freight") basis of customs valuation. In particular, you ask the following three questions:

(1) Whether a CIF basis of customs valuation would contravene Article I, section 8, clause 1, of the Constitution;

(2) Whether such a system of valuation would run afoul of Article I, section 9, clause 6; and

(3) Whether a CIF method is inconsistent with the Fifth Amendment of the Constitution.

We believe the United States can constitutionally adopt a CIF basis of customs valuation. Even though the Supreme Court has not provided definite guidelines regarding the precise application of article I, sections 8 and 9, to the matter in question, the Court's basic interpretation of these provisions, taken together with the relevant constitutional history, persuades us that the adoption of a CIF system would not violate those provisions. Moreover, we believe that the Fifth Amendment does not proscribe a CIF basis of valuation.[1]

The details of such a system and its actual impact on the structure of trade throughout the United States, however, could have a significant bearing on the outcome of any judicial challenge. We can only articulate the governing principles to which any implementation of a CIF system of customs valuation must conform.

---

[1]Our discussion is limited to the questions posed. The question whether the President, as opposed to Congress, is empowered to institute such a system is not addressed.

## I. Customs Valuation

In levying *ad valorem* rates of customs duties—the type in question here[2] —the amount of the duty depends on the customs value to which the rate is applied as well as upon the rate itself. The customs value of an imported article may be assessed in one of two ways. Under the present FOB (''free-on-board'') standard, United States customs officials assign the dutiable value to an imported commodity in isolation from the transportation charges.[3] An FOB system requires officials in general to assess the value of the imported article at the time it was exported, in accordance with applicable guidelines.[4]

In contrast, the CIF (''cost-insurance-freight'') system calls for an assessment of the value of the article and also of the total of freight, insurance, and other transportation charges.[5] The latter costs are included in the final figure setting the imported item's dutiable value, to which an *ad valorem* rate is applied.[6]

A shift by the United States from an FOB to a CIF method would have two primary effects. First, dutiable values would be increased[7] and thus, unless an offsetting decrease in rates or a similar alteration would accompany the switch, customs duties as a whole would rise. A second effect, more directly relevant for constitutional purposes, is that certain inequalities in the valuation of articles imported into this country would result from including variable transportation and other charges in the calculation.

An FOB system of customs valuation itself may result in unequal valuation when physically identical commodities imported into the United States are valued differently because of their varying points of foreign origin. For example, two identical articles from two different sources could have widely dissimilar costs, which therefore would be reflected in different appraisals of the items' dutiable value in an American port due to their disparate ''foreign values'';[8] the disparities would not result from varying costs of transporting the articles to the port of entry. Thus, although under an FOB arrangement, two physically identical items imported from two *different* sources might be valued differently in the same port of entry in the United States, the valuation of such articles from the *same* source—in which, *arguendo*, the cost of the articles is

---

[2]Customs duties can be levied in terms of either *ad valorem* rates, under which a given percentage of the imported article's value is assessed; specific rates, according to which so much is assessed per unit of the imported article; or compound rates, which combine *ad valorem* and specific rates.

[3]*See* R. Vernon, *The Economic Environment of International Business*, 110-111 (1972).

[4]*See, Customs Valuation*, Report of the U.S. Tariff Commission to the Committee on Finance, U.S. Senate, 93d Cong, 1st sess., 27-28 (1973).

[5]*See* Report, footnote 4.

[6]While most nations apply a CIF standard of customs valuation, the United States, Canada, Australia, and a few other countries employ an FOB system, *Id.*, at 28.

[7]*Id.*, at 17.

[8]Historically, a number of standards have been utilized to measure the value of a commodity in the country of origin, including the price charged by the exporter for the shipment of goods in the country of origin; its foreign market value; its cost of production, to be attested to by the manufacturer; and its ''United States value,'' a constructed foreign value. *See* Elliott, *Tariff Procedures and Trade Barriers*, 143-47 (1955).

basically similar—would tend to be fundamentally uniform throughout this country, regardless of the port of entry.

Under a CIF system two physically identical items from the *same* source could be valued unequally in two *different* points of entry in the United States. The variance in the cost of freight and insurance between the exportation point and the respective American ports might be sufficiently great to generate significantly dissimilar valuations at the two different points of entry.[9]

We observe that while an FOB arrangement would not tend to generate inequalities among different States, or among different ports of the same State, with regard to the value assigned to physically identical articles imported from the *same* source, such imbalances could well follow from the adoption of a CIF system.

## II. The "Uniformity" and "No Preference" Clauses

Concern about the constitutionality of a CIF system arises from the requirements of Article I, section 8, clause 1, and Article I, section 9, clause 6, of the Constitution. Clause 1 (the Uniformity Clause) states:

> The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; *but all duties, imposts and excises shall be uniform throughout the United States.* (Emphasis added.)

And clause 6 provides:

> No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another.

A. *The Uniformity Clause.*[10] Since a CIF system of customs valuation, by its very nature, is designed for even-handed application in all States, such a system facially would not discriminate against particular States or ports. You have

---

[9] *See* Report, note 4, at 85.

[10] The language of the Uniformity Clause first confers on Congress the power to assess and collect "taxes, duties, imposts and excises," and then qualifies the power to impose "duties, imposts and excises" by requiring that they be "uniform throughout the United States." The omission in the qualifying phrase of the broadest term, "taxes," indicates that the strictures of the uniformity provision are designed to apply only to a subclass of taxes, denominated "duties, imposts and excises." In a "general sense, all contributions imposed by the government upon individuals for the service of the State are called taxes," whether they are termed a "tribute, talliage, impost, duty, gabel, custom, subsidy, aid, supply, excise, or other . . . .." I.J. Story, *Commentaries on the Constitution of the United States* § 950, at 699 (5th ed., 1891). In particular, "duties, imposts and excises" are "indirect" taxes in the constitutional sense, and are to be distinguished from "direct" taxes, which are required by Article I, section 2, to be "apportioned among the several States . . . according to their respective numbers." Thus, the rule of uniformity applies to "duties, imposts and excises" as indirect taxes, and the rule of apportionment pertains to direct taxes. *See* Story, *supra*, §§ 750-51.

stated that whatever valuation arrangement is adopted by this country, "that method of valuation will be applied uniformly throughout the United States."

Consequently, any constitutional challenge of a CIF valuation system on the basis of the Uniformity Clause must look to its predictable effects, notably, the differentials between total customs duties paid on articles imported at different ports resulting from varying transportation and related charges.

It is a long-established doctrine that the type of uniformity required under the Uniformity Clause is "geographical," not "intrinsic." *See, e.g., Fernandez* v. *Wiener*, 326 U.S. 340, 359 (1945); *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 583 (1937); *Brushaber* v. *Union Pacific Railroad Co.*, 240 U.S. 1, 24 (1916); *Billings* v. *United States*, 232 U.S. 261, 282 (1914); *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 158 (1911); *Patton* v. *Brady*, 184 U.S. 608, 622 (1902); *Knowlton* v. *Moore*, 178 U.S. 41, 83-106 (1900). While the judicial elaboration of this distinction has not always been complete, some discussions, notably that in *Knowlton* v. *Moore*, have set forth the doctrine's core.

In *Knowlton*,[11] the Supreme Court described the principle of "intrinsic" uniformity as requiring that duties, imposts, and excises shall "operate precisely in the same manner upon all individuals," and must be "intrinsically equal and uniform in . . . operation upon individuals." 178 U.S., at 84-85. Thus, the "intrinsic" uniformity requirement looks primarily to the effects of a tax on individuals in different States, and restricts the effects to a strictly circumscribed range.

But if one construes the language "all duties, imposts and excises shall be uniform throughout the United States" as dictating that all such levies shall be "intrinsically equal and uniform," even taking into account a small margin of inevitable variation, then, in effect, one has rendered nugatory the meaning of the words, "throughout the United States." For if intrinsic equality were required, it would apparently be expected to obtain as to all individuals or entities taxed, without any special reference to the States as such. Thus, there would have been no reason for specifically mentioning them. Since a fundamental dictum of constitutional interpretation is not to read the document so as to view some terms in it as surplusage,[12] it seems that "uniform" cannot easily assume the narrow meaning ascribed to it by the "intrinsic" uniformity interpretation.[13]

It is somewhat anomalous to require that only "duties, imposts, and excises," and not other taxes authorized by the Constitution,[14] must be

---

[11]An inheritance tax levied by Congress during the Spanish-American War was objected to in *Knowlton* on alternative grounds; if it was a "direct" tax, it was not properly apportioned among the States; and if an "indirect" tax, it was not sufficiently uniform throughout the United States. The Supreme Court concluded that the levy was not direct, but indirect.

[12]*See* I.J. Story, *supra*, § 910, at 664 (5th ed., 1891) ("The common principles of interpretation would seem to instruct us that the different parts of the same instrument ought to be so expounded as to give meaning to every part which will bear it."); and § 980, at 719 (". . . no part of the Constitution can be considered as useless, no sentence or clause in it without a meaning").

[13]*See, Knowlton*, 178 U.S. at 87.

[14]*See* note 10, *supra*, for the point that the uniformity requirement applies only to a subset of all taxes Congress is constitutionally authorized to levy.

"intrinsically" uniform in their effects. Especially since customs duties and excises are often highly particularistic in their subjects, as well as extraordinarily varied, it would be quite difficult in practice, even if theoretically possible, to be certain that every such Federal tax has intrinsically equal impact on individuals throughout the Nation.[15]

Moreover, an interpretation of the Uniformity Clause which requires Congress to guarantee that the multifarious consequences of a duty, impost, or excise must be identical throughout the United States suffers from the circumstance that Congress is quite unlikely to be certain in advance about the varied consequences of any given taxing system. The full implementation of such a test would demand either extraordinary foresight, or a rigorous retrospective analysis that would effectively render the validity of taxing arrangements directly conditional on the outcome of a subsequent review of the results of a tax. Such a stringent requirement may also significantly constrict the Federal taxing power, perhaps so much—as *Knowlton* feared—as virtually to deny it, even while nominally recognizing it. *See* 178 U.S., at 89.

These difficulties, considerable as they are, may be avoided by interpreting the Uniformity Clause as stipulating, not that the effects of customs duties must be intrinsically equal, but that the *rules* established for levying and collecting them must be generally applied and must be neutral with regard to the States. Such an interpretation is supported by the relevant constitutional history, which shows that the Framers were primarily concerned about the singling out of particular States for favored or disfavored treatment.[16] The Framers' conception of the Uniformity Clause's protection against explicit favoritism was thus elaborated by Joseph Story:

> Unless duties, imposts, and excises were uniform, the grossest and most oppressive inequalities . . . might exist . . . . (A) combination of a few States in Congress might secure a monopoly of certain branches of trade and business to themselves, to the injury, if not to the destruction, of their less favored neighbors . . . . If this provision as to uniformity of duties had been omitted . . . New York and Pennsylvania might, by an easy combination with the Southern States, have destroyed the whole navigation of New England. A combination of a different character, between the New England and the Western States, might have borne down the agriculture of the South; and a

---

[15]As the Supreme Court said in *Knowlton,* 178 U.S., at 88, "Excises usually look to a particular subject, and levy burdens with reference to the act of manufacturing them, selling them, etc. They are or may be as varied in form as are the acts or dealings with which the taxes are concerned. Impost duties take every conceivable form, as may by the legislative authority be deemed best for the general welfare. They have been at all times often specific. They have sometimes been discriminatory, particularly when deemed necessary by reason of the tariff legislation of other countries. The claim of intrinsic uniformity, therefore, imputes to the Framers a restriction as to certain forms of taxes, where the restraint was least appropriate and the omission where it was most needed." *Cf. Head Money Cases,* 112 U.S. 580, 595 (1884) ("Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream.").

[16]This point is made clear in the elaboration of the debates at the Constitutional Convention set forth in *Knowlton,* 178 U.S., at 101-06.

combination of yet different character might have struck at the vital interests of manufacturers. So that the general propriety of this clause is established by its intrinsic political wisdom, as well as by its tendency to quiet alarms and suppress discontents.

To counter the dangers of such "alarms and . . . discontents," the Constitution requires, as *Knowlton* indicates, the even-handed application of duties, imposts, and excises. The "geographical uniformity" that the Uniformity Clause demands "looks to the forbidding of discrimination as between the States, by the levying of duties, imposts or excises upon a particular subject in one State and a different duty, impost or excise on the same subject in another." *Knowlton*, 178 U.S., at 89. As the Supreme Court noted in *Florida v. Mellon*, 273 U.S. 12, 17 (1927), "[a]ll that the Constitution (Art. I, § 8, cl. 1) requires is that the law shall be uniform in the sense that by its provisions the rule of liability shall be the same in all parts of the United States."[17]

It might be argued that there is a central distinction between a variable excise rate, as in *Knowlton*, and a CIF customs valuation scheme, since in the former case inequalities may arise because of the uneven *distribution* of items taxed throughout the United States, whereas in the latter case, inequalities may follow simply from the application of a variable *valuation* standard. Such an argument, however, is specious. The ultimate practical effects of variable rates leading to different amounts of tax levied depending on the quantity and value of imported articles available to be taxed in given States, on the one hand, and of a variable element in the valuation formula, on the other hand, are essentially the same. Moreover, we can discern no support for the notion that the Framers contemplated differentials in the rates of tax, such as those in *Knowlton*, but chose to draw the line at the inclusion of variable factors in calculating the tax base.[18]

Rather, the proceedings at the Constitutional Convention relating to Article I, section 8, clause 1, and Article I, section 9, clause 6, confirm that the Framers sought to prevent direct discrimination against States, not to guard against the incidental side effects of a uniformly applied set of customs regulations. For instance, on August 25, 1787, Messrs. Carroll and Martin, members of the Convention, expressed the apprehension "that, under the power of regulating

---

[17]*See* B. Schwartz, *A Commentary on the Constitution of the United States,* at 171 (1963) (the rule of uniformity means "only that the same principles must be used to define the existence, the amount, and the enforceability of the liability for the tax throughout the entire territorial area of the United States"); H. Rottschaefer, *Handbook of American Constitutional Law* 186-87 (1939).

[18]An unwillingness to draw any such line, grounded apparently on the lack of a serviceable principled distinction, may be seen in lower court decisions permitting as "uniform" differences in taxes resulting from a changing tax base. *See, Standard Oil Co.* v. *McLaughlin,* 67 F. (2d) 111, 114, (9th Cir. 1933) (holding that a Federal tax on the transportation of oil in pipelines does not violate the Uniformity Clause, even though the base on which the tax is computed may vary in different cases, because "[t]he amount of the tax in each case will depend upon the amount of oil transported and the reasonable charge therefor, but all those under the same circumstances will pay the same tax"); *Minature Vehicle Leasing Corp.* v. *United States,* 266 F. Supp. 697, 700 (D.N.J. 1967) (holding that an excise tax on the importation of automobiles with a tax base predicated on their selling price is not unconstitutionally nonuniform, despite natural inequalities resulting from differences in the importers' costs).

trade, the general legislature might favor the ports of particular States, by requiring vessels destined to or from other States to enter and clear thereat, as vessels belonging or bound to Baltimore, to enter and clear at Norfolk, etc."[19] Because of this, they moved and had seconded the following proposition, the forerunner of the No Preference Clause:

> The legislature of the United States shall not oblige vessels belonging to citizens thereof, or to foreigners, to enter or pay duties or imposts in any other State than in that to which they may be bound, or to clear out in any other than the State in which their cargoes may be laden on board; *nor shall any privilege or immunity be granted to any vessel on entering or clearing out, or paying duties or imposts in one State in preference to another.* [Emphasis added.][20]

Also on August 25, General Pinckney and Mr. McHenry submitted what was the predecessor of the Uniformity Clause as follows:

> All duties, imposts, and excises, prohibitions or restraints, laid or made by the legislature of the United States, shall be *uniform and equal* throughout the United States.[21] [Emphasis added.]

After these two proposals had been submitted to the Committee on Detail, the Committee issued a report in which both were embodied in one section,[22] and the words "and equal" were struck from the phrase "uniform and equal" in the Uniformity Clause as originally proposed. That deletion may be fairly interpreted, as indeed the Supreme Court has done, to indicate an intent to erase any implication that strict equality among the States must be achieved.[23]

The final version of the clauses submitted to the Committee of Style provided as follows:

> . . . Nor shall any regulation of commerce or revenue give preference to the ports of one state over those of another, or oblige vessels bound to or from any state to enter, clear, or pay duties in another.
> And all duties, imposts, and excises, laid by the Legislature, shall be uniform throughout the United States.[24]

By the time the Committee of Style issued its report, however, the language dealing with the power to lay and collect duties, imposts, and excises had been transferred to a separate section,[25] and the Uniformity Clause in its final form remained distinct from the No Preference Clause.[26] Thus, the Uniformity and

---

[19]5 Elliot's Debates 478-79 (1845).

[20]*Id.*, at 103.

[21]*Id.*, at 479.

[22]That section provided, *id.*, at 502:

"Nor shall any regulation of commerce or revenue give preference to the ports of one state over those of another or oblige vessels bound to or from any state or enter, clear, or pay duties in another; And all tonnage, duties, imposts, and excises, laid by the Legislature *shall be uniform* throughout the United States." [Emphasis added.]

[23]*See, Knowlton,* 178 U.S., at 104.

[24]2 Farrand, *The Records of the Federal Convention of 1787,* at 571 (1937).

[25]*See, id.,* at 594, 596.

[26]*See, id.,* at 610 n. 2 & 614.

No Preference Clauses, although unified in their intent and original adoption, became separated during the stylistic arranging of the Constitution. Both clauses are fundamentally directed toward guarding against attempts by Congress to enact an explicitly discriminatory taxing system benefiting given ports or States.[27]

Accordingly, to the extent that the language and purpose of a CIF system of customs valuation establish the same governing principles throughout the country, the CIF system is not barred by the Uniformity Clause.

B. *The No Preference Clause*. In applying the restriction of Article I, sec. 9, cl. 6, that no "preference" be given to the "ports of one State over those of another," it appears that to the extent that the development of a CIF system of valuation requires only the articulation of entirely general rules with respect to all States, no particular port would need to be provided for, much less preferred, in terms. Once again, the issue is whether that clause bars a CIF customs valuation scheme with somewhat variable effects in absolute or "intrinsic" terms.

In the first place, the precise consequences of a CIF system of valuation would appear to be both unpredictable and changeable. Thus, it is implausible to view such a system as a method of systematically preferring any particular port over any other. Such a specific preference is what the No Preference Clause's language and history, as canvassed above, are primarily directed against. A CIF system of customs valuation confers no special advantages on any particular ports; *a fortiori* it would escape the proscriptions of that provision.

Furthermore, to the extent that certain incidental benefits may be directed to some ports from a CIF system of valuation, such preferences would result from geography, and, as the Supreme Court put it in *Alabama G.S.R. Co.* v. *United States*, 340 U.S. 216, 229 (1951), *quoting with approval, ICC* v. *Diffenbaugh*, 222 U.S. 42, 46 (1911), "[t]he law does not attempt to equalize fortune, opportunities or abilities" in this regard.[28]

We consider that any preference that may accrue to a port as a result of a CIF system of valuation would be incidental and permissible under the No Preference Clause.

---

[27]*See, Knowlton*, 178 U.S., at 106. A customs valuation system taking into account variable transportation costs is not proscribed. The tariff levied by the First Congress included, in addition to the basic *ad valorem* rate, an increment of ten or twenty percent, which was to correspond roughly to the cost of transporting merchandise from the country of origin. *See* Customs Administration Act, July 31, 1789, 1 Stat. 29. Section 17 of that Act provided:

> And be it further enacted, that the ad valorem rates of duty upon all goods, wares and merchandise, at the place of importation, shall be estimated by adding twenty per cent to the actual cost thereof, if imported from the Cape of Good Hope, or from any place beyond the same; and ten per cent on the actual cost thereof, if imported from any other place or country, exclusive of all charges.

[28]*Cf., Armour Packing Co.* v. *United States*, 209 U.S. 56, 80 (1908). ("The fact that a regulation, within the acknowledged power of Congress to enact, may affect the ports of one State more than those of another cannot be construed as a violation of this constitutional provision [the No Preference Clause].")

## III. The Fifth Amendment

You are also concerned that a CIF system of valuation may, in its application, draw classifications in violation of the Equal Protection principle implicit in the Due Process Clause of the Fifth Amendment.[29] Such a challenge would rest on the premise that classifications generated by a CIF system are substantively unreasonable and arbitrary in their inequalities.[30]

Since this is not a case involving one of the so-called "fundamental rights" or "suspect" classifications—such as classification based on race—to which the Supreme Court has demonstrated special sensitivity by engaging in different forms of heightened scrutiny,[31] the basic question is whether the classifications resulting from a CIF system are rational in the sense of serving the ends for which the system is designed.[32]

Any distinctions in the amounts of customs duty levied in different American ports on identical articles under a CIF system would be related to variations in transportation and similar charges incurred from the point of origin to the ports of entry. A CIF system is, of course, constructed precisely to take these costs into account. In the absence of a discriminatory intent against any State or port, which, if it existed, would in any event fly in the face of the Uniformity and No

---

[29]*See, Bolling* v. *Sharpe,* 347 U.S. 497, 499 (1954).

[30]Since *Bolling* v. *Sharpe,* considerations of equality have been found to be implicated in the Due Process Clause of the Fifth Amendment. *See, e.g., Buckley* v. *Valeo,* 424 U.S. 1, 93 (1976). ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.") *Cf., Hampton* v. *Mow Sun Wong,* 426 U.S. 88, 100 (1976). (The Court noted, in the context of a challenge to a Civil Service Commission regulation barring noncitizens from employment in the Federal competitive civil service, that although both the Due Process Clause of the Fifth Amendment and the Equal Protection Clause of the Fourteenth Amendment "require the same type of analysis," nevertheless "the two protections are not always co-extensive," and "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State.")

[31]Political choices resulting in classifications burdening fundamental rights or indicating prejudice against racial or other minorities have been subjected by the courts to closer analysis, or stricter scrutiny, in an effort to preserve the ideal of equality. *See, e.g., Shapiro* v. *Thompson,* 394 U.S. 618 (1969) (the fundamental right to travel); *Hunter* v. *Erickson,* 393 U.S. 385 (1969) (race as a suspect classification); *Reitman* v. *Mulkey,* 387 U.S. 369 (1967) (race as a suspect classification). *See generally* Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 8 (1972).

[32]The basic requirement of Equal Protection analysis is that a legislative classification be minimally rational. "The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose . . . ." *McLaughlin* v. *Florida,* 379 U.S. 184, 191 (1964).

Preference Clauses, a CIF system may not be said to lack the requisite minimum rationality required by the Fifth Amendment.[33]

We are therefore of the view that the Fifth Amendment does not bar the adoption of a CIF system.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[33]It cannot be said definitely that distinctions resulting from a CIF system of valuation have no conceivable basis in fact, or that they are not grounded ''upon a state of facts that reasonably can be conceived to constitute a distinction, or difference in . . . policy.'' *Allied Stores of Ohio* v. *Bowers,* 358 U.S. 522, 530 (1959). *See generally* Tribe, American Constitutional Law §§ 16-2, 16-3 (1978).